JOHN P. EHLINGER, COUNTY JUDGE, ET AL. v. J. E. CLARK.

No. 4670. Decided June 25, 1928.

(8 S. W., 2nd Series, 666.)

*J. P. Ehlinger,* plaintiff in error, filed brief in pro. per.

*R. H. Clark* and *H. W. Wallace,* for defendant in error.

The oil and gas lease in question is an attempted conveyance of an interest in the Fayette County school land, for a consideration, which in part is something other than money, and was void for that reason. Thomason v. Upshur County, 211 S. W., 325; Texas Co. v. Daugherty, 107 Texas, 226, 176 S. W., 717, L. R. A. 1917 F, 989; Staley v. Derden, 57 Texas Civ. App., 142, 121 S. W., 1136; Dallas County v. Club L. & C. Co., 95 Texas, 200, 66 S. W., 294; Taber v. Dallas County, 101 Texas, 241, 106 S. W., 332; Pulliam v. Runnels County, 79 Texas, 363, 15 S. W., 277; Tomlinson v. Hopkins County, 57 Texas, 572; Midland County v. Slaughter, 61 Texas Civ. App., 328, 130 S. W., 612; Stephens County v. Mid-Kansas Oil & Gas Co., 254 S. W., 290; Logan v. Stephens County, 98 Texas, 283, 81 S. W., 110; San Augustine County v. Madden, 87 S. W., 1056; Gallup v. Liberty County, 122 S. W., 291; Cassin v. La Salle County, 21 S. W., 122; Davis v. Texas Co., 232 S. W., 549; Sibley v. Pickens, 273 S. W., 897; Waggoner v. Wichita County, 3rd Fed. Rep., 2nd Series, 963, 964.

*Charles L. Black* and *Nelson Phillips* as *amici curiae,* by leave of the court, filed briefs in support of the validity of the lease.

*J. T. Robison, Smith & Gibson* and *E. F. Smith,* also by leave, filed briefs as *amici curiae* in support of the validity of the lease.

*S. C. Padelford,* by leave, filed brief as *amicus curiae* attacking the validity of the contract here involved.

Mr. Chief Justice CURETON delivered the opinion of the court.

This suit was instituted by Fayette County, through its county judge, against I. E. Clark, to recover the amount due upon two notes, each for the sum of $2000.00, executed by the defendant in error in favor of John P. Ehlinger, County Judge of Fayette County. The defense was that the Commissioners' Court of Fayette County was forbidden by law to enter into the contract and agreement out of which the notes arose, and that the notes were therefore illegal and void. Upon trial before the court without a jury, the defense was sustained, and recovery on the notes denied. The county appealed the case to the Court of Civil Appeals, and the judgment was affirmed. 284 S. W., 974.

The notes were part of the consideration for the execution of an oil lease on the school lands of Fayette County. The contract was in the form of two written instruments, each containing many stipulations, some of which are not material. We shall, however, as a matter of convenience and accuracy, copy the material portions of the contract. The contract was entered into on the 4th day of April, 1920, between the Commissioners' Court of Fayette County and I. E. Clark. By the terms of the contract an oil lease was made on the school lands belonging to Fayette County, located in Baylor County. The land is definitely described in the contract, and contained some 4000 acres. Those portions of the contract which we deem material read as follows:

"That the Lessor, for and in consideration of $5.00, cash in hand paid by I. E. Clark, the receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of Lessee, to be paid, kept and performed, and the further consideration of two (2) notes, of even date herewith, each for the sum of Two Thousand ($2000.00) DOLLARS, bearing 5% interest per annum from date hereof due respectively December 14th, 1920, and December 14, 1921, signed by I. E. Clark and payable to J. P. Ehlinger, County Judge of Fayette County, Texas, and his successors in office, for the use and benefit of the Fayette County Permanent School Fund, has granted, demised, leased and let unto the said Lessee, for the sole and only purpose of mining and operating for oil and gas, laying pipe lines, and building tanks, power stations and structures thereon to produce, save and take care of said productions, all that certain tract of land, situated in the County of Baylor and State of Texas, described as follows, to-wit: (Here follows a description of the land).

"It is agreed that this lease shall remain in force for a term of five (5) years from this date, and as long thereafter as active drilling operations are carried on thereon by Lessee, or as oil or gas or either of them is produced from said land by Lessee.

"In consideration of the premises, the said Lessee covenants and agrees,

"1st. To deliver to the credit of Lessor, free of cost in the pipe line to which it may connect its wells, the equal one-eighth (⅛) part of all oil produced and saved from the leased permises.

"2nd. To pay the Lessor the rate prevailing in said field at and during the period of production, for the gas from each well where gas only is found while the same is being used off the premises, and

Lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time by making his own connections with the well at his own risk.

"3rd. To pay Lessor for gas produced from any oil well and used off the premises at the rate prevailing in said field at and during the period of production, for the time during which gas shall be used, said payments to be made, each three months in advance.

"Also to pay Lessor one-eighth ($\frac{1}{8}$) of the net proceeds derived from the sale of casing head gas, utilized in the making of gasoline.

"If no well be commenced on said land, on or before the 14th day of April, 1921, this lease shall terminate as to above parties, unless the Lessee, on or before that date shall pay or tender to the Lessor, or to J. P. Ehlinger, the said County Judge of Fayette County, Texas, or his successor in office, at office in La Grange, Texas, the sum of TWO HUNDRED ($200.00) DOLLARS, which shall operate as a rental, and gives the privilege of deferring the commencement of a well for twelve (12) months from said date. In like manner and upon like payments or tenders, the commencement of the well may be further deferred for like period of the same number of months successively.

"And it is understood and agreed that the conditions first recited herein, the down payment covers not only the privilege granted to the date when said first rental was payable as aforesaid, but also the Lessee's option of extending that period as aforesaid, and any and all other rights conferred.

"Should the first well drilled on the above described land be a dry hole, then, and in that event, if a second well is not commenced on said land within twelve months from the expiration of the last rental period for which rental has been paid, this lease shall terminate as to both parties, unless the Lessee on or before the expiration of said twelve months shall resume the payment of rentals in the same amount and in the same manner as hereinbefore provided. And it is agreed that upon the resumption of the payment of rentals, as above provided, that the last preceding paragraph hereof, governing the payment of rentals and the effect thereof, shall continue in force just as though there had been no interruption in the rental payments.

"If said Lessor owns a less interest in the above described land than the entire and undivided fee simple estate herein, then the royalties and rentals herein provided for shall be paid the said

Lessor only in the proportion which its interest bears to the whole and undivided fee.

"Lessee shall have the right to use, free of cost, gas, oil and water produced on said land for his operations thereon, except water from tanks or wells of Lessor.

"When requested by Lessor, Lessee shall bury his pipe line below plow depth.

"No well shall be drilled nearer than 200 feet to the house or barn now on said premises, without the written consent of Lessor.

"Lessee shall pay for damages caused by his operations to growing crops on said land.

"Lessee shall have the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing.

"If the estate of either party hereto is assigned—and the privilege of assigning in whole or in part is expressly allowed—the covenants hereof shall extend to their heirs, executors, administrators, successors or assigns."

On the same day the foregoing agreement was entered into, a supplemental agreement, made a part of the preceding, was also executed. The material portions of this supplemental agreement read as follows:

"First: That this contract is supplemental to that oil and gas lease contract, for and upon 4000 acres of Fayette County School Land, situated in Baylor County, Texas, made and entered into by the parties hereto, on the 14th day of April, 1920, and as evidenced by the written agreement signed by the parties, and duly preserved in the Records of said Commissioners' Court, to which reference is here made, and the same is made part hereof for all purposes.

"Second: That the two notes, each for the sum of $2000.00, dated April 14, 1920, due respectively December 14, 1920, and December 14, 1921, bearing 5% interest per annum from April 14, 1920, shall be paid and discharged without reference to whether said lands are developed and are proven productive of oil or not; but in the event that said land is developed and proves productive of oil, or is sub-leased, or such leases transferred and assigned, then out of any and all proceeds, arising from the sale or sublease, transfer and assignment of the oil and gas lease, hereinabove referred to, or any bonus or royalty that may be received thereon one-fourth (¼) of all such proceeds shall be held, used and paid over to the said I. E. Clark, until said one-fourth (¼) of all such proceeds shall

equal an amount to the principal amount of said two notes, aggregating $4000.00, together with all interests paid thereon; and after said one-fourth (¼) shall equal the amount of such principal and interest paid thereon, then the remaining one-fourth (¼) of all such proceeds shall belong to and be paid over to, as received, J. P. Ehlinger, County Judge of Fayette County, Texas, or his successor in office, at office, in La Grange, Texas, for the benefit of the Fayette County Public School Fund."

The county school land here involved was acquired by Fayette County and held by it by virtue of Section 6 of Article 7 of the Constitution, which, in part, reads:

"All lands heretofore or hereafter granted to the several counties of this state for educational purposes, are of right the property of said counties respectively, to which they were granted, and title thereto is vested in said counties; and no adverse possession or limitation shall ever be available against the title of any county. Each county may sell or dispose of its lands, in whole or in part, in manner to be provided by the Commissioners' Court of the county. * * * Said lands and the proceeds thereof, when sold, shall be held by said counties alone as a trust for the benefit of public schools therein. * * *"

The Court of Civil Appeals held that the Commissioners' Court, under the constitutional provision quoted, did not have authority to execute the above contract, evidenced by the two agreements, because it was in effect a conveyance of an interest in the school lands of Fayette County for a consideration which in part was not money and on the authority of the case of Thomason v. Upshur County, 211 S. W., 325, struck down the contract and the notes.

In the case of Thomason v. Upshur County, the Court of Civil Appeals did hold that such a contract as this, providing for the payment of a royalty as a part of the consideration for a mineral lease constituted a sale for something other than money and was, therefore, void. The Supreme Court denied a writ of error in that case, but the contract there involved contained other features. Among other things, it provided for a joint undertaking between the grantee and the county in the establishment of a townsite, in the course of which the county was to donate without consideration a thousand acres of land to the undertaking. The donee was to bear the expense of plotting it out and putting it in shape for a townsite, and the county was to have every other lot in the townsite. It was, of course, too plain for serious discussion that this joint undertaking

by which the county was to furnish a thousand acres of land out of its school lands without payment therefor was void, because a grant of public property without consideration and a plain diversion of the school lands of the county in violation of the Constitution. There were other questions involved in the case, but when the case reached the Supreme Court on application for writ of error the contract then under examination contained not only the clause providing for the payment of royalty upon oil development, but the plainly void clause for the gift of this land in the promotion of a townsite. The Supreme Court refused the writ of error, and thereby held that the judgment of the Court of Civil Appeals was correct, but it was not our purpose by the refusal to approve all that the Court of Civil Appeals had said, or all the grounds upon which they base their own conclusion that the contract involved in that case was void, and the refusal of the writ of error under the jurisdictional statutes then existing does not have that effect. Davis v. Lanier, 94 Texas, 455, 456, 61 S. W., 385; Aspley v. Hawkins, 99 Texas, 380, 89 S. W., 972; American Indemnity Company v. Austin, 112 Texas, 239, 252, 246 S. W., 1019.

Lands acquired by virtue of legislative enactment under the section of the Constitution quoted have been involved in litigation before this Court on various occasions.

In the case of Tomlinson v. Hopkins County, 57 Texas, 572, the record shows that Hopkins County had two unlocated land certificates by virtue of this section of the Constitution and enactments made thereunder. It made a contract with Tomlinson to locate them and procure a patent, agreeing to give him one-third interest in the land for so doing. His title was later attacked, and this Court held that the county had no power to give a part of the school lands to pay the expenses of location, and that the deed was properly cancelled. The donation, in this instance under legislative grant, was coupled with the express provisions that the county should pay in money the expenses of locating and surveying the land, and the fees which even the county could pay were also limited. Manifestly the opinion of this Court was correct, and the case has no bearing on the issues involved in the instant case. The case of Pulliam v. Runnels County, 79 Texas, 363, 15 S. W., 277, is similar to the one just discussed.

In the case of Dallas County v. Club Land & Cattle Co., 95 Texas, 200, 66 S. W., 294, this Court held that the Commissioners' Court had no authority under the Constitution to convey a part of the

public school land as compensation to one employed to subdivide it for the purpose of putting it on the market. This decision is apparently based on the proposition that the proceeds of county school lands, when sold under the Constitution, "shall be held alone as a trust for the benefit of the public schools therein," the court concluding that a debt created by a county as an expense incurred in selling school lands cannot be charged against the lands themselves or the proceeds of the sale. It is unnecessary to state in detail how the Court arrived at this conclusion, but it was predicated primarily upon the public policy of the State, shown by previous statutes, in requiring the counties to pay the expenses of locating school lands granted to them under the Constitution, which policy is shown in the two previous cases discussed. It was in this case that this Court, in an opinion by Chief Justice Gaines, stated: "It would seem, therefore, that the conveyance of the land for any other consideration than that of money would be unauthorized." This expression in the opinion is plainly dictum, as it was obviously not the purpose of the Court to hold that the land could not be sold for notes or other consideration of actual value. This is shown by the fact that in the same opinion the Court said: "It would seem that if a county as a trustee of a special school fund had incurred a debt which was properly chargeable against the fund, its commissioners might sell a part of the land directly to the creditor in discharge of the debt." The case of Taber v. Dallas County, 101 Texas 241, 106 S. W., 332, as we understand it, does not hold that county school lands can not be sold for a consideration other than money, but only that whatever the consideration may be it must go to the trust fund represented by the land and can not be diverted to the settlement of obligations which the county must settle out of its general revenues. The case is similar in principle to the other case discussed above.

Regardless, however, of the doctrine contained in the case of Dallas County v. Club Land & Cattle Company case, supra, and the meaning attributed to the Taber case by the Court of Civil Appeals in the case before us, this Court has definitely settled the question that county school lands may be sold upon a consideration other than money. Delta County v. Blackburn, 100 Texas, 51, 93 S. W., 419; Waggoner v. Wise, 17 Texas Civ. App., 220, 43 S. W., 836; Foard County v. Sandifer, 105 Texas, 420, 151 S. W., 523. These cases generally hold that sales of county school lands may be on a credit for notes, and that with respect to such transactions the power of

county commissioners is similar to that of individuals. In the Delta County case this Court in part said:

"Whether a sale shall be made for cash or on credit, and by executed conveyance or executory contract, are questions evidently committed to the Commissioners' Court; and it may be conceded that, where a credit sale is made under an executory contract, the county, represented by its Commissioners' Court, is invested with the power over the title remaining in it which an ordinary grantor would usually have under a like form of contract; that its power to cancel the sale for default in performance by the vendee, to resume its title and to resell would be as perfect as would be the power of an individual under like circumstances." Delta County v. Blackburn, 100 Texas, 55, 93 S. W., 420.

Having concluded that Fayette County, acting through its Commissioners' Court, did have power to sell the entire estate in its school lands upon considerations other than actual cash, it necessarily follows that it may also sell its mineral estate in the lands for a consideration other than money. That the mineral estate can be separated from the remainder and sold is not an open question. Theisen v. Robison, (ante, p. 489, 8 S. W., 2nd Series, 646), this day decided but not yet reported. The real questions then for determination are whether or not there was a sale of the mineral estate in this case, and if 'so whether the sale was upon a valuable and lawful consideration. We think the questions must be answered in the affirmative.

None of the cases cited against the validity of the contract here involved, and referred to and discussed by us, have any bearing upon the issues involved in the present case, except the Upshur County case, to which we have previously adverted.

In the case at bar the consideration for the mineral contract in general terms was $5.00 in cash, $4000.00 in notes, and one-eighth of all oil produced from the land, delivered to the credit of the county free of cost in the pipe line to which producing wells might be connected, and also an agreed price for gas that might be produced from the land. The Court of Civil Appeals held that this contract was invalid, because for a consideration other than money, and because it amounted to a diversion of a portion of the oil and minerals in the land, a part of the land itself, to pay for the necessary cost of bringing the minerals to the surface for sale. The question of the necessity of a cash consideration alone is disposed of above, and the conclusion that because Clark, the lessee, obtained a certain portion of

the oil under the contract there was an unlawful diversion of the school fund is unsound. The contract is not subject to this interpretation. Under the contract, as we view it, the county parts with its title to all the minerals in place, and obtains a moneyed consideration of $4000, and, in addition, the usual one-eighth royalty from the oil produced. That such a transaction is a sale of the minerals in place is the established law, we think, in this State.

The language of the contract that the county "has granted, demised, leased, and let unto the said lessee for the sole and only purpose of mining and operating for oil and gas * * * all that certain tract of land," means plainly that an actual estate in the land, to-wit, · the mineral estate, has been conveyed without reservation as to any part of it. Stephens County v. Mid-Kansas Oil & Gas Company, 113 Texas, 160, 29 A. L. R., 566, 254 S. W., 290; see also Thomason v. Reed, 263 S. W., 1069; Summers on Oil & Gas, pages 197, 198. In the authority last cited the author states:

"There perhaps no longer can be any doubt as to the nature of the interest created by an oil and gas lease in Texas, for in seven decisions handed down within the scope of three days the Supreme Court of that state reaffirmed the doctrine of Texas Co. v. Daugherty to the effect that oil and gas in the ground are capable of ownership, and that the effect of the lease conveying oil and gas for mining purposes creates a corporeal interest in them in place, subject to be defeated by breach of condition subsequent. In reaching this conclusion, the particular type of the granting clause has no bearing as evidenced by the words of the Court in Stephens County v. Mid-Kansas Oil & Gas Co., a grant of the land for oil and gas purposes, where it was said by the Court: 'We find it impossible to reasonably ascribe to the two sets of instruments, disregarding mere form and looking at substance any different legal effects as regards the transfer of the title to oil and gas in place.' "

· It is true that after the oil has been reduced to possession by the lessee and brought to the surface, one-eighth of it must be delivered to the county. Because of this there is some theoretical ground for argument against our conclusion that the whole of the oil in place is granted, but there exists no practical basis for difference of opinion about it. Plainly under the contract the county has surrendered its right to explore for and produce oil on the premises, including the so-called one-eighth royalty. Without the right to explore for and produce this one-eighth of the oil, the right is utterly worthless. It has no value for any practical purpose. It can only be made

valuable by exploration and production, a right clearly granted away to Clark under this contract. We think, therefore, regardless of the language used, the proper interpretation of the contract is that the county has sold the whole of its mineral estate in the land, subject, of course, to the terms of the contract with reference to exploration, deferred drilling, etc. We think the purchase price is the $4000 evidenced by the notes specified in the contract and one-eighth of the oil, not as it existed in place, but after, by the expensive process of exploration, drilling, and production, the oil has been captured and reduced to possession, produced at the surface of the earth, and delivered at the intake of the pipe line as personalty. The oil when thus delivered is not only a different thing from the same amount of oil hidden away in the bowels of the earth but represents a different type of estate. In the process of exploration and production its status has been changed from real estate to that of personalty, and we see no reason why under its changed status it may not be used to pay in part for the mineral estate which Clark obtained under the contract. Such contracts are the usual and ordinary ones, and enforced, as being upon valid considerations, in every jurisdiction in this country. Corsicana Petroleum Co. v. Owens, 110 Texas, 568, 222 S. W., 154; Stephens County v. Mid-Kansas Oil & Gas Co., supra; Summers on Oil & Gas, sec. 73; Thornton on Oil & Gas (4th Ed.), Chapter 7—on Rents and Royalties. See also Heard v. Pratt, 257 S. W., 660. In fact, "Royalty" is a term of ancient origin, long used to designate the returns of the crown or state for the right of taking public minerals. Thornton on Oil & Gas (4th Ed.) sec. 253; Theisen v. Robison, (ante, p. 489, 8 S. W., 2nd Series, 646), this day decided but not yet reported; Encyclopædia Britannica (13th Ed.).

There is nothing in the constitutional provision here involved which in the remotest degree limits the right of the Commissioners' Court to make a sale of its mineral estate upon terms similar to those made by citizens generally. The language of the Constitution is: "Each county may sell or dispose of its lands in whole or in part in manner to be provided by the Commissioners' Court of the county." If the makers of the Constitution had intended that the county might sell and dispose of its lands, in whole or in part, for cash only, that purpose and intention could have been expressed with ease in the Constitution, and would have meant a very different thing to the language which was actually used.

That the contract here involved, which was one undoubtedly of advantage to the county, whether in fact the land had or did not have oil and gas beneath its surface, was not an actual diversion of the school fund property, we think fairly well illustrated by the cases of Texas Cent. Ry. Co. v. Bowman, 97 Texas, 417, 79 S. W., 295, and Imperial Irrigation Co. v. Jayne, 104 Texas, 395, 138 S. W., 575, Ann. Cas., 1914 B, 322.

In the first case, the facts were that one Bowman purchased a section of school land and denied the railroad a right of way, on the theory that the Legislature was without power to grant a way or easement on these lands. The railroad company claimed the right of way by virtue of the legislative grant of rights of way over school lands. Bowman claimed the Legislature was without power to make such grant because the school lands had been declared a perpetual school fund, and section 7 of the very article of the Constitution before us in the present case had provided that the land set apart for the school fund should be sold with such regulations, at such times, and on such terms, as might be prescribed by law. The case reached the Supreme Court, and this Court, in an opinion by Associate Justice Williams, held that the grant of right of way made by the Legislature extended to public school lands, and that this power of the Legislature was not restricted by the constitutional provision involved. This Court in part said:

"The purpose for which the school lands are required to be sold is the raising of money to support the schools, and this may be promoted in many ways by the exercise of other powers of the Legislature. Such powers are left in that body by the Constitution, and may be employed upon this land whenever the attempted exercise does not conflict with, and especially where it promotes, the power to sell to advantage. To the advancement of the purpose of selling the land advantageously, by settling up the country, bringing them into demand and thereby increasing their value, the Legislature might well regard the granting to railroad companies of rights of way over them as legitimate means."

In the case we have just quoted from there was plainly a legislative grant of what amounted to a perpetual easement over school lands, a thing of very substantial value, at least in many instances. It was not a sale of the land in the usual sense of the term, but it did undoubtedly add value to the land, and this Court held, as shown above, that the Legislature might well regard the grant of the right of way as a legitimate means for selling the land advantageously,

settling up the country, and increasing the value of state school lands. In the case of Imperial Irrigation Co. v. Jayne, there was involved an Act of the Legislature giving irrigation companies the right of way for ditches and canals over public lands, and the right to condemn property for dams and reservoir sites. The Irrigation Company attempted to acquire right of way and reservoir sites on State school lands. This was resisted, on the ground that the Legislature should only sell these lands, and could not permit them to be so used. This Court held that the Legislature had the power to permit this use of school lands by irrigation companies, upon grounds similar to those declared in the Bowman case, just referred to. In part this Court said:

"It has been held and it seems with great force of reason that the purpose of the Constitution was not to restrict the Legislature in dealing with the public school lands further than to say they shall be sold, and that the purpose of the constitutional provision was not to fetter the Legislature with restrictions so narrow as to deprive it of the exercise of that generous and wise policy in dealing with the public domain in order to foster public enterprises and thereby promote the general welfare of the whole people. Such a construction of the Constitution would deny the Legislature the power to authorize the opening of public roads over the public school lands, or the granting of rights of way to railroad companies, or sites for public school houses, or sites for dams or reservoirs to furnish water to the people of our cities located in the arid and semi-arid sections of the State. It would also stop the building of telegraph and telephone lines and cripple the entire commerce of the country."

\*    \*    \*    \*

"In our opinion the authority of the Legislature to deal with the public school lands by granting easements thereon for the building of dams and reservoirs for the storage of large bodies of water for irrigation purposes, being in furtherance of the value of such lands, is a power rather expressly given by the Constitution than denied by implication."

\*    \*    \*    \*

"In arriving at this conclusion we are not unmindful of those constitutional provisions relating to the public school lands and the public school fund, providing for the perpetuation and nondiversion of that fund around which the organic law has placed an armor forged by the strong arm of the sovereign people, and no less are we impressed with the sacred obligation to obey its mandates and

construe its language and meaning in such manner as may comport with that obligation. This we believe we have done and in so doing will have added to instead of taking from or diverting that fund."

We think the cases quoted from sustain in principle at least our conclusion that the school lands here involved may be sold on a royalty basis. In the cases quoted from there was plainly a grant of certain easements over the lands of the State, so broad in terms and long in time that they amounted to a substantial permanent occupancy of the school lands, but this court held that since the uses contemplated were plainly advantageous to the trust fund, to-wit, the school fund, involved, it was within the power of the Legislature which was the trustee in those controversies, to grant the easements.

We have no doubt that the Commissioners' Court in the case before us concluded that the contract executed by them was advantageous to the school fund of Fayette County. We are constrained to believe that the Commissioners' Court realized that there was no authority in law for the county to enter upon the costly experiment of exploring for oil on its school lands, that there were no funds available for such purpose, and that, therefore, the best course for them to take to develop their oil lands, and obtain funds therefrom for the school fund of their county, was to make a contract similar in form, substance, and effect to thousands of contracts made by private individuals throughout the State and throughout the country. To say that they did not have the power to do this, would amount to a denial to them of that paramount jurisdiction over the subject of the sale of these lands declared in the Constitution, and would amount to a denial of the right of Fayette County, for all practical purposes, to have its oil lands developed. This contract, entered into between Clark and Fayette County, was one "in manner provided by the Commissioners' Court of the county," is not different in its purpose and effect from the usual contract for mineral development, and we see nothing in the Constitution to prohibit the court from entering into the usual contract for the development of mineral lands.

The Commissioners' Court evidently concluded that the notes for $4000 and one-eighth of the oil in the ground when captured, reduced to possession and delivered at the surface of the earth was a fair price for the whole of the oil in place in the bowels of the earth. If so, they were acting within their constitutional power, and when they adopted that consideration as a part of the manner of dis-

posing of the mineral estate they were doing that which the broad language of the Constitution permitted.

The contract was not one in breach of the trust conferred upon the court, but one plainly carrying out and effectuating that trust. When the court made this contract, in so far as the evidence before us in concerned, they did no more nor less than a prudent man, having due regard for his own property and fortune, would have done. It was plainly an act to conserve and make productive the natural resources owned by the school fund and subject to disposition by the court in such manner as it might provide.

The contention that because the contract under its terms would permit Clark to obtain seven-eighths of the oil which might be found in the ground it is a diversion of the oil belonging to the county, fails to take into consideration the peculiar nature of oil and the manner of conducting the oil business. Oil in place is universally regarded as a fugitive substance, to which no one has title to the extent of and by which he may follow it after it passes the boundaries of his own land. He can protect his claim to the oil and the chance for it by keeping trespassers off of his own land, but he is utterly unable to prevent adjoining land-owners from drilling wells through which they may drain his land and obtain valid title to the oil which had it been captured while on his own property would have been his. It follows from this that in truth and in fact the county has no property in any particular oil which may be upon its land which it can make effective until it has explored for, captured, and reduced it to possession. Under the contract before us, Clark undertook to explore for, capture, and reduce to possession all of the oil beneath the surface of the county's land. It is a matter of common knowledge that this would necessarily entail an enormous expense and a risk which, so far as we know, none of the 248 counties of this State, nor the State itself, has undertaken in the remotest degree. We think that we may also say that it is a matter of common knowledge of the history of the times that but exceedingly few owners of land have ever undertaken such an enterprise on their own lands. Exploration and development for oil is a business so hazardous that it is followed in the main only by those engaged in the oil business with enormous resources, or by others who for a speculative purpose join together for such an enterprise. To say that under the broad language of the constitutional provision before us the Commissioners' Court of Fayette County was compelled to either enter upon such a hazardous undertaking, for which, in view of the

laws of the State we judicially know it had no funds and no authority, or to stand by and permit its valuable oil lands to go undeveloped, or the oil be drained therefrom by its neighbors, because it could not enter into the ordinary and usual contract for oil development, is to give this constitutional provision a construction and interpretation not only at utter variance with the broad language used, but one, it seems to us, inconsistent with sound business principles and common sense.

In other cases disposed of on this day by this Court (but not reported), to-wit: Theisen v. Robison, (ante, p. 489) ; Greene v. Robison, (ante, p. 516), and other cases, the statutes, and contracts made pursuant thereto, provided for royalty payments in amounts equal in value to one-eighth of the oil produced. These have been sustained by us in the opinions this day delivered. We are unable to find any practical difference between the payment made in money, in amount equal to one-eighth of the oil produced, and the actual payment in oil, a commodity which we know is readily convertible into cash. If the one is a diversion of the school fund, the other is necessarily such a diversion,—but, neither is a diversion. The contract before us is simply the usual one made generally over the country by those who sell mineral rights, and well within the constitutional powers of the Commissioners' Court to make.

We do not think that the additional consideration provided for in the supplemental contract, contingent upon sales by Clark of mineral rights, militates in the least against the conclusion at which we have arrived, that the general contract was within the power of the Commissioners' Court to make.

Prayer is made in the petition for judgment not only for the balance of the principal and interest due upon the notes sued upon, but for attorney's or collection fees as well. The record being presented as an agreed case, or upon an agreed statement of facts, judgment must be rendered for the plaintiffs in error for the amount of the principal and interest due upon the notes sued upon; but judgment cannot be rendered for the attorney's or collection fees prayed for. The notes read:

"And if default should be made in the payment of this note at maturity and it should be placed in the hands of an attorney for collection, or suit should be brought on the same or same be presented for payment in the probate court or the court of bankruptcy or other proceedings in any court be had to enforce its payment, an additional amount of ten (10) per cent. upon the sum of principal

and interest, which shall be due to the owner, at date of collection or judgment, shall be added and paid as collection fees."

The language thus used evidences a contract of indemnity, and not one for liquidated damages. First National Bank of Eagle Lake v. Robinson, 104 Texas, 166, 135 S. W., 372; Lanier v. Jones, 104 Texas, 247, 136 S. W., 255. If the record were silent on the specific question of the employment of an attorney and collection fees, then, under the authorities cited, we might be authorized to permit the recovery. But, the record is not silent on the subject. The statement of facts declares:

"Since the institution of this suit the Commissioners' Court of Fayette County have made and entered an order ratifying all things done by the County Judge in the above matters, including the institution of suit, and other things performed by the County Judge in regard to leasing said land and endeavoring to collect said notes, and authorized the County Judge, as attorney at law, to conduct this litigation in behalf of Fayette County, and agreed to pay him for his services the ten per cent. collection fees stipulated in the notes."

It is thus seen that the attorney who represents the plaintiffs in error in this case was the County Judge of Fayette County when the Commissioners' Court, of which body he was a member, employed him as an attorney at law to conduct this litigation, and agreed to pay him the ten per cent. attorney's or collection fees specified in the notes. If our interpretation of the facts stated is correct, then this contract of employment is void.

Section 6 of article 7 of the Constitution, in virtue of which Fayette County obtained the school lands involved in this litigation, vests title to these lands in the counties for educational purposes, and declares, as we have heretofore seen, that "each county may sell or dispose of its lands, in whole or in part, in manner to be provided by the Commissioners' Court of the county." Other provisions of the section already appear in this opinion. The closing clause of the section expressly declares: "and the counties shall be responsible for all investments."

These provisions of the Constitution undoubtedly confer upon the county, through its Commissioners' Court, authority to determine when default is made in the performance of any contract by the vendee of lands when sold, or in the payment of notes when executed by such a vendee, and generally have such powers an individual would have under like circumstances. Delta County v. Blackburn, 100 Texas, 155. In addition, Article 2351, Revised

Statutes, in subdivision 8, expressly declares that the Commissioners' Court shall "provide for the protection, preservation and disposition of all lands granted to the county for education or schools." Section 18 of Article 5 of the Constitution declares that the county commissioners, with the County Judge as presiding officer, shall compose the county Commissioners' Court, which exercises such power and jurisdiction over all county business as is conferred by the Constitution and the laws of the State. In addition to the foregoing, various Articles of the statutes show that the county Commissioners' Court is the active governing body of the county, with a jurisdiction that touches in some respect almost every feature of the county's business.

The County Judge, as a member of the Commissioners' Court of Fayette County, had the constitutional and statutory duty placed upon him of not only executing the contracts sued upon in this suit, but of seeing that these contracts were carried out by the defendant in error Clark, and finally collecting the identical notes sued upon, in so far as the collection of these notes was placed upon the Commissioners' Court. If the court in the course of its proceedings found it necessary to employ an attorney to collect these notes, then the County Judge, as the presiding officer of that court, had the constitutional and statutory duty imposed upon him of presiding over the court in its deliberations while selecting an attorney, and of participating therein as such officer. On the other hand, if after an attorney was employed it should be found that the attorney was not performing his duties in a competent or faithful manner, it would become the duty of the Commissioners' Court, presided over by the county judge, to relieve such attorney of his duties and employ another. It is because of the obvious incompatibility of being both a member of a body making the appointment and an appointee of that body that the courts have with great unanimity throughout the country declared that all officers who have the appointing power are disqualified for appointment to the offices to which they may appoint. 29 Cyc. 1381; 22 R. C. L. page 414, sec. 56.

We think the employment of the county judge as an attorney by the Commissioners' Court, over which he presided, comes clearly within the rule that the appointing power, in this instance the Commissioners' Court, cannot appoint as its attorney one of its own members, to-wit: the county judge, as was done in this case, and that therefore the contract of his employment as attorney, in so far as it provided for compensation, was void. Since the contract of

employment is void, the proof in the record negatives any expense of collection or for attorney's fees on the part of the county, and it has therefore expended nothing in this respect for which it must be indemnified by the defendant in error. We do not say that the county judge had no authority to appear in the case and represent the county. On the contrary, he did have that authority because of his office, but for a like reason he could not become the employed attorney of the county in this proceeding.

We do not deem it necessary to discuss any other question.

The judgments of the District Court and of the Court of Civil Appeals, in so far as they denied recovery in accordance with the prayer of the amended petition of the plaintiffs in error for recovery on the notes sued on and cancellation of the lease or contract here involved, will be reversed and judgment here rendered for plaintiffs in error in accordance with said prayer and this opinion. The judgment dismissing defendant in error's cross-action will not be disturbed by our decree.

*Affirmed in part, and in part reversed and rendered.*