## FEDERAL ROYALTY CO. v. STATE.
### No. 2558.

Court of Civil Appeals of Texas. El Paso. Sept. 24, 1931.

Rehearing Denied Oct. 22, 1931.

Ike S. Handy, of Houston, for appellant.

Hart Johnson, of Ft. Stockton, and Brian Montague, of Del Rio, for the State.

**WALTHALL, J.**

This suit was brought by the state of Texas, in the district court of Pecos county, against the Federal Royalty Company, a corporation, with its principal office in Harris county, Tex., to recover the taxes, interest, penalties, and costs alleged to be due for the year 1929, and to foreclose the tax lien on a royalty interest in oil and gas in two sections of patented public school lands situated in Pecos county; the said two sections of land being fully described in the petition. The lands are situated in the eastern portion of Pecos county in what is generally known as the Yates oil field.

The case was tried to the court without a jury, and appealed to this court upon an agreed statement of facts.

In view of the issues presented here, we deem it unnecessary to state the pleadings of the parties more than to say that the suit was brought by the county attorney of Pecos county, Hon. Hart Johnson, on behalf of the state, for the collection of the taxes, interest, penalties, and costs and the foreclosure of the tax lien on the lands described as the property of defendant for the year 1929, the lands being unrendered for taxes in Pecos county, and delinquent in the payment of taxes assessed against said property.

The defendant answered by general demurrer, special exceptions, and general denial; the contention made by the defendant being that no assessment for taxes was made and that the royalty interests owned by it were in fact personal property and not real property, and not subject to taxation in Pecos county.

Judgment was rendered against defendant; defendant duly excepted, gave notice, and has perfected this appeal.

### Opinion.

Appellant submits that "the assessment under which the taxes sued for were made was void because not made by the Tax Assessor of Pecos County."

Appellee submits that the assessment was a valid assessment.

On the issue as to the making the assessment on the property in controversy, the record, very briefly stated, shows: The parties agree in writing to the following: It was agreed that on January 1, 1929, the appellant was the owner of the interests described in the petition, under and by virtue of the following written instruments; that the interests are correctly described on the tax rolls of Pecos county for the year 1929, as unrendered property, and that the same are correctly described on the delinquent tax roll of said county for said year; agreed that all notices prerequisite to filing suit for delinquent taxes were given; demand was made for payment of such taxes, and that defend-

ant failed and refused to pay same or any thereof. Appellant being the owner of the interests in the property, we need not, under this proposition, state the character of the interests owned in determining the validity of the assessment more than to say that the interest held is such as is held by what is commonly known as mineral deeds, and a lessee under the usual form of an oil and gas lease, hereinafter more particularly stated.

The record and agreement shows that on September 10, 1928, Pecos county, acting by and through the commissioner's court of that county, by reason of the many years of experience in the matter of appraisals and valuations of such properties for tax assessments possessed by Thomas Y. Pickett & Co. of Dallas, Tex., employed that company to compile a list of the record owners of all producing oil and gas properties wherever situated or located in Pecos county, Tex., and undeveloped leases and royalty interests adjacent thereto, as of January 1, 1929, and 1930; said compilation and record to show the particular interest, or interests therein owned, to secure for Pecos county all information possible and available for the use of Pecos county, sitting as a board of equalization in determining the proper valuations to be fixed upon such properties for assessment and taxation purposes; and generally to compile such information as shall be of aid and benefit to Pecos county in equalizing the values of such properties for taxation; to meet with the commissioners' court of Pecos county, Tex., sitting as a board of equalization, and to furnish said board all the information secured by them during their investigations for the purpose of equalizing the assessments upon such properties; to make a survey of all pipe lines, refineries, tank farms, and tankage, and all other properties of value used in connection with said oil and gas development, including transportation facilities.

The assessment of the property made by the assessor, and, in doing so, the use made by him of the information in the form of an inventory made by Thomas Y. Pickett & Co., is shown by the evidence of the assessor, which we copy at length.

"My name is J. L. Moore and I live in Fort Stockton, Pecos County, Texas. I hold the official position of Tax Assessor of Pecos County, which position I have held continuously for the past eight years, and once before, all told twenty-three years. The six sheets of paper which are handed me clipped together are a part of filed documents and records of my office as Tax Assessor. They are copies of what purports to be an inventory. An original was made at the time a copy was made. These were made up by Thos. Y. Pickett & Co. who are employed to get up these inventories and they delivered to me the original to mail out to the owner

and I mailed the original out. The original was not signed and returned by the owner. The original and copy are made and where the property is not rendered by the owner I gave to the owner that original copy for his signature. The original was mailed by me to The Federal Royalty Company and was not returned signed. In other words, the Federal Royalty Company did not render its inventory to me of any property it might own in Pecos County for 1929 for the purpose of taxation. And this file or clip of papers which I have in my hand is the carbon copy of the original which was mailed to The Federal Royalty Company and after that time, I used this copy for presentation to the Board of Equalization of Pecos County and after its action this clip of papers was returned to me by the Board of Equalization and I have since retained it as a part of the files and documents of my office. I used this for the purpose of placing on the unrendered rolls the property subject to taxation in Pecos County for the year 1929 of the property of the Federal Royalty Company. The taxes on these sheets are estimated on these sheets according to each item and are copied from this on the roll; the roll is a copy of this, and this file of papers constitutes a copy of my office. From examination of these sheets it appears that some figures are in colored pencil and some in ordinary lead pencil. As I remember the colored figures are exactly as they appeared on the originals. The lead pencil figures did not occur on the originals. These figures were the ones that were decided on by the Board of Equalization and delivered to me.

"The book which you now tender me is the tax roll for the year 1929 for Pecos County, Texas. It is a permanent record in my office. When these copies are completed I deliver one to the County Clerk, one to the State Comptroller and I keep one in my office.' It is the duty of the Tax Assessor to prepare that roll and it was prepared under my supervision. Turn to Form 'D', page 42. Beginning with line 35 through 44 as it appears on page 42 of Form 'D,' roll of unrendered property in Pecos County, assessed for taxation by Tax Assessor, J. L. Moore for the year 1929; when the State Equalization Tax Board fixes the rate of state taxes I am then notified by it of the rate of the State Tax; there is a copy sent to me by the Comptroller, a copy of the State Tax rate for 1929 was sent to me. I used this rate in determining the State Tax on the valuations of land shown in this assessment. The County Commissioners of Pecos County fix the County and Common School Tax rate. This land is in the Independent School District. This figure I have here is for the Sheffield Independent School District. I assess property for the Independent School District of Sheffield. The trustees of the Independent School District meet and make levy and the President or Secretary notify me

what their rate is. I was advised in the year 1929 of the rate determined for the Sheffield District. The County Tax is fixed by the Commissioners and I was advised of the County Tax rate for 1929. In determining the amount of taxes I used the rate of which I was advised by the State Tax Board and those rates were computed on the values that appear in this assessment.

"I have only one regular deputy. I have men who do other work around the County. In 1929 I had the deputy who works here now, Mr. Valentine, and I had a deputy at Buena Vista, Mr. J. F. Heagy and one at Iraan, Mr. Mitchell. I had no members of the firm of Thos. Y. Pickett & Company or no employee of Thos. Y. Pickett & Company in my employ as deputy tax assessor. The assessments of this property for taxes on which the Federal Royalty Company is being sued were not made by me nor were they made by any of my deputies, but were made by Thos. Y. Pickett & Company. Thos. Y. Pickett & Company obtained the evidence on which those values were fixed. I do not know what process they used, whether they used the basis of daily production or whether they estimated the oil reserves in the ground, but I think it was on the barrel. I know nothing about the valuations of oil property. I have no idea as to how much oil was under any of the tracts of land involved in this litigation in 1929. I made the statement that I did not make the assessments. I refer to the assessments that are shown on the six sheets of paper as inventory of property. These sheets were in fact prepared by Thos. Y. Pickett & Company as the names appear on this roll and the description of the property and valuations. There were two copies of each of these sheets, an original and a copy and some official or agent of the Thos. Y. Pickett & Company delivered these two sheets of paper to me as they were prepared. They delivered the original to me to mail out, they retained the copy and when the original was not signed they delivered the copy to me to put before the Board of Equalization. I knew that Thos. Y. Pickett & Company had been employed by Pecos County for making appraisal of mineral properties in this County and I knew the person who did this work to be a representative of Thos. Y. Pickett & Company.

"When he handed me this paper I accepted it from him as representing the name of the owner purporting to own the property, as shown by that paper, and as representing the ownership whether in lease or minerals as were shown on that particular sheet of paper and representative of the final value of that property. There is a column on this sheet which reads 'Values.' The same was on this sheet and the original which was mailed to the Federal Royalty Company. It was a part of my duty, as Tax Assessor of Pecos County

to value properties for the purpose of taxation, I stated a few minutes ago that I was aware that Thos. Y. Pickett & Company had been employed by Pecos County to appraise and determine the values of mineral land. When the agent or representative of Thos. Y. Pickett & Company handed me the sheet of paper containing the inventory of property of the Federal Royalty Company I accepted what appeared on that paper at that time and forwarded to the Federal Royalty Company without making any changes. I received and accepted those sheets of paper in my official capacity as Tax Assessor and as such I put them in my files. Those others I mailed out to the owner. My purpose in mailing them out to the owner was that they might sign and return them as rendition of their property. The original was not signed and returned to me. The copy which I retained, and which are the sheets of paper which are clipped together here, were put in among the files, papers and documents of my office as Tax Assessor of Pecos County, Texas, for the year 1929, for the Federal Royalty Company. When the Board of Equalization met I tendered these same six sheets of paper for their consideration.

"After the Board of Equalization met the six sheets were delivered back to me and I took them back to my office and filed them as unrendered inventory of property and as the assessment for the year 1929 against the Federal Royalty Company. On the first sheet appears the valuation of $14,220.00. Immediately under which appears $13,125.00, which was the value placed by the Board of Equalization. On the second sheet the value is $23,-175.00 with a line drawn through it, and above it, $17,115.00. That was the figure fixed by the Board of Equalization. Sheet Number 3 has a total figure of $164,003.00. Sheet Number 4 has an original figure of $27,460.00 and beneath, $25,340.00, which is the value fixed by the Board of Equalization. Sheet Number 5 has the figure $59,835.00 with a line drawn through it and the figure $55,230.00. That is the value fixed by the Board of Equalization. Sheet Number 6 has the figure $90,465.00 with a line drawn through it, and the figure $83,-500.00 which is the value placed by the Board of Equalization.

"I do not recall having written to The Federal Royalty Company in response to a letter asking information about the original of those six sheets; a letter in which I stated that 'these assessments were all made by Thos. Y. Pickett & Company and I know nothing about it.' I probably did write it though. I refer anyone to Thos. Y. Pickett & Company as they are employed to get them and I refer to them. As a matter of fact I did not make these assessments, nor did I arrive at these valuations nor was it done by any of my deputy Tax Assessors. When the sheets were turned into my office I did not examine them for the pur-

pose of determining whether the values were proper. I did not know whether they were proper or not. As a matter of fact, these values might be ten times more or less of the values as far as I know. I do not know anything about the values. Every value fixed on oil properties, insofar as any property in this suit is concerned was made by Thos. Y. Pickett & Company, and I knew nothing about it at the time they fixed that value, nor have I known since. I accepted the information, forwarded the original to the Taxpayer and filed the copy in my office. That copy without change on my part was delivered to the Commissioners' Court. The Commissioners' Court authorized him (Thos. Y. Pickett & Company) to make the changes. There were a lot of oil people here at that time and they agreed on a lower basis and they turned back to Thos. Y. Pickett & Company according to what they agreed on and they then assessed and made those other values and they were turned over to me. I have nothing whatever to do with the fixing of the values.

"When I received the set and filed it in my office I received and filed it as an assessment of the property. I had nothing to do with the manual preparation or the determining of the values of the property but after that figure was reached and the information put on the paper and delivered to me I did file it as the assessment against The Federal Royalty Company. The figures placed there are not my own.

"The only evidence I have of the value of any of this property is that statement made by Thos. Y. Pickett & Company. I made no inquiry and if persons had appeared before me to furnish evidence that the values were too high I would have referred such persons to Thos. Y. Pickett & Company."

For brevity, without quoting, we refer to the trial court's tenth finding of fact in the matter of the assessment and rendition for the property for taxes for the year 1929.

The six inventory sheets referred to in the above statement of Tax Assessor Moore were introduced in evidence.

Appellant introduced in evidence the six statements of taxes charged against it; same being the statements rendered to the appellant by the tax collector of Pecos county.

The testimony of Assessor Moore shows that the six sheets, carbon copies of the original inventory prepared by Thos. Y. Pickett & Co., were presented to the board of equalization by the assessor and used by the board in fixing the values of the property.

Appellee in its brief calls our attention to an error in the testimony in respect to sheet No. 3. By reference to Exhibit C (S. F. 47), it is apparent that the assessor was looking at the column which evidences the tax calculated as being $1,640.03, instead of a total of $164,003, and that the value of the prop-

erty there assessed, as originally submitted, was $102,105, and changed by the board to $94,254.

As suggested by appellee, it is manifest that the record presented discloses the following: On January 1, 1929, appellant was the owner of the property described in the various assessment rolls; that it did not render such property for taxation in Pecos county for that year; that its existence and approximate value were ascertained through an agency created for that purpose by Pecos county; that such information on duplicate assessment lists was given to the tax assessor of Pecos county, who in turn mailed the original of such list to the owner domiciled in Harris county to enable it to sign such list and make rendition of that property for the purpose of taxation for the year 1929 in Pecos county; that, having failed to make such rendition, the tax assessor thereupon submitted a carbon copy of such list to the board of equalization of Pecos county as an assessment of unrendered property for that year against the Federal Royalty Company; that the same was considered by the board of equalization as an assessment of the value of the property, the value in each instance being reduced by the board, the lists furnished the board returned to the tax assessor by the board with directions to enter such property for the purposes of taxation for that year against the Federal Royalty Company on the unrendered roll of 1929 taxes.

The record shows the regular meeting of the board of equalization of Pecos county for 1929, and at such meeting the board had under consideration the fixing, determining, and equalizing the value of all taxable property in that county for that year, and among other matters the minutes of that meeting recite: "The following property was found to be unrendered by the Tax Assessor and the Board of Equalization after carefully considering the values recommended by the Assessor and finding the same to be fair and equitable and in proportion to the final values placed on like properties owned by others, whether rendered or unrendered, instructed the assessor to place the following described property on the unrendered roll at the values herein below set out." (Then follow the property involved here with the values as above.)

The record shows the minutes of a session of the commissioners' court held on October 27, 1929, at which the tax rolls of said county for that year were submitted, examined and approved.

The question presented under this proposition is: Was the assessment void because not made by the tax assessor?

■ Appellant discusses and refers us to several articles of the statute and to a number of cases, all of which we have reviewed. They deal mostly with voluntary renditions made by the taxpayer. It is the law that all tax assessments, to be valid, must be made as provided by the statute. Here we are considering an assessment for taxes for which no rendition was made to the assessor by the owner and where the tax due, if any, has not been paid. In view of the holding of the courts in Roper v. Hall ·(Tex. Civ. App.) 280 S. W. 289, and the cases there cited, and the case of Maud v. Terrell, 109 Tex. 97, 200 S. W. 375, and the case of Von Rosenberg et al. v. Lovett (Tex. Civ. App.) 173 S. W. 508, 509, it would be useless to discuss the authority of the commissioners' court of Pecos county to enter into the contract shown in the record with Thos. Y. Pickett & Co. Such services there contracted to be rendered called for information and experience not ordinarily possessed by the assessor, and neither the assessor nor the commissioners sitting as a board of equalization, in the performance of their duties in the discovery, assessment, and valuation of unrendered oil and gas properties, can perform their several duties effectively without such expert aid. Evidently the purpose of the contract was to aid the office in the performance of the respective duties. The aid contracted for .is in the exercise of the powers and duties imposed by law upon the assessor of taxes and the commissioners sitting as a board in the matter of listing and assessment of property for taxation in the county where situate. Where, as in this state, no express authority is given to employ such expert aid, the power to do so is implied, and the expedience of doing so is within the discretion of the commissioners' court. We do not understand appellant as denying the authority of the commissioners' court to make the contract found in the record, but does insist that the use made by the assessor and the board of equalization, of the sheets as an inventory and valuation of the property furnished by Thos. Y. Pickett & Co., was not an assessment by the assessor or the board, and for that reason no legal assessment was made. It is true the assessor said that he had no personal knowledge as to the value of the oil property. He used the assessment lists and valuations furnished by Thos. Y. Pickett & Co. as his valuations, and furnished same to the board, and which the board used and acted upon in fixing the values. The assessor, in person, acting in his official capacity, accepted the sheets furnished him by Thos. Y. Pickett & Co., and in person, as assessor, used and made use of them as his assessment in fixing the assessed values of the property. The trial court found that "such Tax Assessor adopted said duplicates (of said inventories) and filed the same as his assessment and rendition of the property described therein for taxation for the year 1929," and delivered same to the board. The board made use of the same duplicate inventories furnished by the assessor in fixing the assessed values of the property for that year.

The board of equalization did fix the tax valuations of said property for the year 1929. They approved the lists and returned them to the assessor for making up the general rolls.

We think it might be said, and it is the most that could be said in view of the testimony, that, independent of the aid of Thos. Y. Pickett & Co., the assessor did not in person or by deputy discover the property in controversy not listed to him; that he did not in person or by deputy prepare the lists and write in the list columns the items therein written. However, the assessor and the board of equalization, with the expert aid of Thos. Y. Pickett & Co., did all that was required by the statute to a full and complete assessment of the property. Considering appellee's independent proposition, it is apparent from the record that appellant is and was at all of the times mentioned the owner of the property in controversy, that the taxes sued for had not and have not been paid, and that the taxes sued for are not in excess of the limit allowed by law. City of Rising Star v. Dill (Tex. Civ. App.) 259 S. W. 652; same case affirmed (Tex. Com. App.) 269 S. W. 769; Zachry v. City of Uvalde (Tex. Civ. App.) 24 S.W.(2d) 517.

We have concluded that the assessor and the board of equalization could, as they did, properly make use of the expert information and assistance rendered in the assessment and fixing of the values on the property, and that by doing so the assessment was not made void as not made by the assessor, as submitted by appellant.

The remaining contention of appellant is submitted under two propositions, and to the effect that the royalty interest provided for in the lease under which appellant claims title covering the sections of land involved in this suit does not constitute an interest in real estate, but is in fact personal property, and is not subject to rendition for taxes in Pecos county; that, regardless of the language of a lease executed by the owner of the surface of school lands wherein such owner acts individually and as agent for the state, the royalty which is to be paid under the terms of said lease is paid as liquidated damages and not as consideration for the grant.

Appellee's counter proposition to the above is, that the royalty interest provided for the leases covering the sections of land involved herein is "realty," and subject to taxation as such in Pecos county.

The trial court's second finding reads as follows: "I find that Sections 101, Block 194, T. C. Ry. Co. and Section 60, Block 1, I. & G. N. Ry. Co. were patented by the State of Texas, in the years 1894 and 1884 respectively, without mineral classification; I further find that Section 32 Block 194, G. C. & S. F. Ry. Co. was sold in 1908 by The State of Texas to T. F. Hickox, and that at the time of the sale of said Section 32 the same was Public School Land and was classified as Mineral and Dry Grazing, and that in said sale all minerals pertinent to said section were reserved to The State; said Section 32 has never been patented and I. G. Yates is now the owner of said Section as Assignee of T. F. Hickox; I. G. Yates also owns said Section 60 in Block 1, I. & G. N. Ry. Co. and the estate of Mrs. M. A. Smith, deceased, owns Section 101, Block 194, T. C. Ry. Co. All of the respective ownerships above set out being subject to the various leases and conveyances of mineral interests hereinafter set out."

The royalty interest in the above-described tracts of land became the property of the Federal Royalty Company as follows: An assignment of an undivided one-sixteenth in said section 32, block 194, by mineral deed dated February 4, 1924, in favor of Lee Hager; a mineral deed dated February 4, 1924, executed by I. G. Yates and wife, conveyed to Lee Hager an undivided one-sixteenth interest in said section No. 60, block 1; an assignment executed by Lee Hager on December 16, 1926, in favor of Federal Royalty Company conveying a certain fractional interest in said section No. 32 and said section No. 60; an assignment dated April 2, 1924, executed by Lee Hager in favor Federal Royalty Company conveying a certain fractional interest in said section 32 and said section No. 60, above described. An assignment executed by Mrs. M. A. Smith and husband of date October 20, 1926, conveying to E. C. Marrs, by mineral deed, an undivided one-half interest in section 101, above described, and a mineral deed of date December 8, 1926, executed by E. C. Marrs, conveying to the Federal Royalty Company an undivided one-half interest in said survey 101, block 194. In view of the agreement of the parties that appellant owns the interest in the property in controversy as alleged in the petition, and that such interest is a royalty interest, a further statement of such interest is unnecessary to the points to be decided, the value of such interest not being involved.

The court found that each of the leases covering the above-described tracts of land contained the following clause with reference to the royalty accruing under the terms of said lease: "To deliver to the credit of lessor, free of cost, in the pipe line to which he may connect his wells, the equal one-eighth part of all oil produced and saved from the leased premises."

The above finding of the trial court is not questioned by appellant.

■■ A discussion or review of the many cases to which we are referred would be unnecessary. The suit is to recover taxes on the royalty interest as real estate, and the question presented is, Is the royalty interest real estate or personal property?

In Hager v. Stakes, 116 Tex. 453, 294 S. W. 835, 842, on a certified question involving taxation of a royalty interest in minerals, and other questions incidentally involved, the Supreme Court, speaking through Judge Greenwood, after reviewing many cases referred to and discussed in the briefs here, said:

"Our answers to all the certified questions might be rested on the following propositions: First. That minerals in place are realty, and as such are subject to ownership, severance, and sale, as settled by the decisions in Texas Co. v. Daugherty, 107 Tex. 234, 176 S. W. 717, L. R. A. 1917F, 989, and Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566.

"Second. That a severance may be accomplished by means of a conveyance of the minerals or by means of an exception or reservation in a conveyance, as clearly pointed out in the opinion of Chief Justice Cureton in Humphreys-Mexia Co. v. Gammon, 113 Tex. 256, 254 S. W. 296, 29 A. L. R. 607, and in the cases there cited.

"Third. That in every instance one who owns a tract of land or an undivided interest therein, including the minerals, can be divested of his interest in minerals in place only by a deed containing words sufficient to operate as a conveyance of an interest in land, as distinctly held in W. T. Waggoner Estate v. Wichita County, 273 U. S. 113, 47 S. Ct. 273, 71 L. Ed. 566, and in States Oil Corporation v. Ward (Tex. Com. App.) 236 S. W. 446. However, no technical words, are necessary, but effect will be given to whatever language discloses the intent to divest the owner of his mineral estate, in whole or in part.

"Fourth. Each of the leases set out in the certificate left the lessor with an interest in minerals which was real property.

"Fifth. Real estate is ordinarily taxed as a unit; yet, where there have been severances by conveyance, exception, or reservation, so that one portion of the realty belongs to one person and other portions to others, each owner should pay taxes under proper assessment against him of the portion owned by him. The fact that a portion may consist of minerals or of a fractional interest therein makes no difference, as outlined in State v. Downman (Tex. Civ. App.) 134 S. W. 787, and Downman v. Texas, 231 U. S. 356, 357, 34 S. Ct. 62, 58 L. Ed. 264.

"Sixth. The Texas Constitution and statutes leave no room for doubt that all property of every kind is subject to taxation, and, as long as such property consists of minerals in place or fractions of same, the taxes should be assessed and collected thereunder as on any other species of real estate."

The court held that the interests of the lessees or their assigns in the minerals involved in the leases set out in the certificate are taxable in the county where the lands are situated.

In the instant case, the royalty interest in the above-described tracts of land became the property of the Federal Royalty Company as follows: Giving here only the section and block numbers, the conveyances are substantially as follows:

Ira G. Yates and wife, for a cash consideration paid, grant, bargain, sell, convey, set over, and assign and deliver unto Lee Hager an undivided one-sixteenth interest in and to "all of the oil and gas in and under and that may be produced from," the land described, being sections 32 in block 194, situated in Pecos county, with right of ingress and egress for mining purposes, etc., and removing same therefrom. The instrument recites that the land is now under an oil and gas lease, and that the conveyance is made subject to said lease; and covers and includes one-half of all the oil royalty and gas rental to be paid under the terms of said lease. It is agreed that all money rentals to extend the lease are to be paid to the grantor, and, in the event of forfeiture, all oil and gas underlying the land to be owned jointly by grantor and grantee in proportion stated. The grant is dated February 4, 1924.

The next conveyance is a mineral deed from Ira G. Yates and wife, which, for a cash consideration paid, grants, bargains, sells, conveys, sets over, and assigns and delivers unto Lee Hager an undivided one-sixteenth interest in and to all of the oil and gas "in and under and that may be produced from" the land described as situated in Pecos county, being section 60, the block number left blank in the conveyance, but apparently found by the court to be in block 1, with right of ingress and egress for mining purposes; the land is stated to be under an oil and gas lease, and the conveyance is made subject to the lease, and covers an undivided "½ of all the oil royalty and gas rentals to be paid under the terms of said lease"; the money rentals to extend the terms of the lease to be paid to the grantors, and, in the event of forfeiture, "all the oil and gas underlying the above described land shall be owned jointly by grantee and grantor," in proportion as above.

A warranty deed from Lee Hager to the Federal Royalty Company, of date December 16, 1926, apparently a correction conveyance of an instrument of date April 2, 1924, whereby Lee Hager, in consideration of money paid, conveys to the Federal Royalty Company "a royalty interest in all of the oil and gas in and under and that might be produced from" the lands described and situated in Pecos county, being said sections 32 and 60, block 194. The instrument "conveys all of my right, title, claim and interest in and to the above described land and the minerals

therein and thereunder, including $^{35}\!/_{96}$ of the royalty on all the oil and gas heretofore produced or which may be hereafter produced from said above described lands."

A royalty deed from Lee Hager to the Federal Royalty Company, of date April 2, 1924, reciting that by deeds of date February 4, 1924, Yates and wife conveyed to him, Lee Hager, "a ½ interest in the royalty of all the oil and gas in and under and that may be produced from," the lands described and situated in Pecos county, and being said sections 32 and 60, in block 194. After some whereases, not necessary to state, Lee Hager, for a cash consideration paid, "grants, sells and conveys" to the Federal Royalty Company "an undivided ½ interest in and to all of said above described $^{35}\!/_{96}$ royalty interest."

An agreement, of date December 20, 1924, between Mrs. M. A. Smith and husband. Mrs. Smith in her own right and as guardian of estates, as stated, as lessor for a cash consideration paid, "grants, conveys, demises, leases and lets" for the purpose of mining for oil and gas, etc., and taking care of the products, to E. C. Marrs, the land described and situated in Pecos county as section 101, block 194. The lease is for ten years and as long as oil or gas is produced therefrom. The lessee covenants to deliver to the credit of lessor in tanks or pipe lines the equal one-eighth part of all oil produced and saved; to pay a rental stated where no well is commenced; the lessor warrants the title.

A mineral deed from E. C. Marrs to the Federal Royalty Company, the deed not dated but acknowledged December 8, 1926. The grantor, for a cash consideration paid, "grants, sells, conveys, assigns and delivers" seven-eighths of an undivided one-half interest in and to "all the oil, gas and other minerals in and under, and that may be produced from," the land described and situated "in Pecos County, being survey 101, Block 194," the land conveyed to him by Mrs. M. A. Smith, with right of ingress and egress for purpose of mining, etc. The instrument recites that the land is under an oil and gas lease, and the sale is made subject to said lease, but covers and includes seven-eighths of one-half of all oil royalty and gas rental or royalty due and to be paid under the terms of the lease, no money paid to extend the term of the lease to be paid to grantee, and, in event of a forfeiture of the lease, an undivided one-half of the lease interest and all future rentals on land and minerals shall be owned by grantee.

The ownership of the property involved and a proper description of same in the petition and the assessment items having been admitted, the above references to the instruments conveying the interests have been stated for the sole purpose of stating the character of title under which appellant owns the property.

We construe the above instruments in each instance to convey minerals in place in the lands. We think the case of Hager v. Stakes, supra, and the cases there cited, rule the instant case as to the realty character of the property owned by appellant.

We think we need express no opinion as to whether the case of Ehlinger v. Clark, 117 Tex. 547, 8 S.W.(2d) 666, is in conflict with the Hager v. Stakes Case, and feel that the opinion in the Hager v. Stakes Case states the law by which we are to be governed until the Supreme Court makes a contrary ruling.

We have concluded that no reversible error is made to appear, and the case should be affirmed. It is so ordered.

Affirmed.