GLADSON *v.* WILSON.

4-5201                                          120 S. W. 2d 732.

Opinion delivered October 24, 1938.

P. A. *Lasley*, for appellant.
*Bernal Seamster*, for appellees.

GRIFFIN SMITH, C. J. Appellees are citizens and tax-payers of the City of Fayetteville, Arkansas. They brought this suit to restrain the appellant from serving as superintendent of the Fayetteville water plant; to restrain payment of $200 per month as salary to appellant, and to recover $4,400 salary paid.

On final hearing the injunctive relief was granted, but the court declined to give judgment for salary collected. There was an appeal and cross-appeal.

Acting under authority of § 7366 of Pope's Digest, the City of Fayetteville, in September, 1925, enacted an ordinance by which it assumed full management of the water plant. The ordinance provided that the plant be "turned over to a Board of Managers consisting of five qualified electors, to be elected by the City Council." The number was later increased to six. Such managers were to "take the oath of office required by the Constitution and laws of the state of Arkansas, and forthwith meet at some convenient place, by notice to each member, and proceed to organize by electing one of their number as

chairman, and such other officers as they may see fit."
The council reserved the right "to at any time dispose
of the services of either one or all of said Board of
Managers, with or without cause, . . . and said
Board shall be subject, at all times, to the direction of
the said City Council."

It is admitted in the answer that appellant is one of
the three Commissioners for Water Improvement District No. 1, operation of which was taken over by the city
in 1925.

Appellant contends that when the city assumed control of the water plant it acquired full authority of administration, . . . "and thereafter the management,
control, and operation of the water plant has been vested
in and exclusively exercised by the said Board of Managers, and said Board of Commissioners has not, since
the date of said ordinance, operated, managed, or exercied any control whatever over the said water plant, and
has not been concerned in the operation or the employment or discharge of the employees engaged in the management of said property. It is admitted that on July
23, 1937, a meeting of the Board of Managers . . .
employed the defendant as superintendent of said city
water plant at a salary of $200 per month." There is
denial that the Board of Commissioners of the Water
Improvement District employed defendant.

Admitted facts are that in 1933 a member of the
Board of Managers died. He was also a member of the
Board of Commissioners. Thereupon the City Council
appointed E. M. Ratliff a Commissioner. It is denied
that he was appointed to the Board of Water Managers.
Ratliff was then employed by the Board of Managers
as superintendent at a salary of $200 per month. In
July, 1935, Ratliff became ill and was granted a leave of
absence. August 1, 1935, at Ratliff's suggestion, appellant was employed by the Board of Managers as acting
superintendent, and he entered upon his duties as such.

October 7, 1935, Ratliff resigned from the Board of
Commissioners of Water Improvement District No. 1;
and October 14, 1935, appellant was appointed to the

Commission. It is claimed by appellant that Ratliff did not resign from the Board of Managers—if, in fact, he was ever a member—and that appellant was not appointed a member of the Board of Managers, and did not qualify as such.

Ratliff died in December, 1935. Salary checks issued from August, 1935, through January, 1936, were payable to Ratliff.

The following statement appears in appellant's brief: "After the death of Ratliff the appellant, with knowledge, consent, and approval of the Board of Water Managers, continued as acting superintendent of the water plant until this suit was brought in August, 1937. All salary checks were payable to the appellant that were issued after January, 1936."

In September, 1937, the City Council passed a resolution discharging all members of the Board of Water Managers. New members were appointed. A circumstance urged by appellant in support of the contention that he was not a member of the Board of Managers is that the Council gave notice of discharge to other members of the Board of Managers, but did not so notify appellant.

Finally, appellant takes this position: First, when he was employed by the Board of Water Managers as acting superintendent, there was no legal obstacle to prevent him from serving. Second, his later appointment as Commissioner of District No. 1 did not disqualify him as superintendent because (a) his contract was with the city, acting through the Board of Water Managers; and (b) the Improvement District, under the law, had nothing to do with operation of the water plant.

Appellant further insists that, since he was never appointed, and did not qualify, as a member of the Board of Water Managers, he was neither a *de jure* nor a *de facto* member; and the fact that he at times made motions and voted as a member of the Board "is not sufficient to, and did not, disqualify him from acting as superintendent, when his original employment was legal in all respects."

Although minutes of the City Council recited that appellant filed his oath as a member of the Board of Managers, the City Clerk testified that this was an error; that the oaths actually filed related to his appointment as Commissioner of the Water Improvement District, and as Commissioner of Sewer Improvement District No. 1. Countervailing was testimony of the clerk that the minutes read: "The mayor declared W. N. Gladson a commissioner of Sewer Improvement District No. 1, and of Board of Managers of City Water Plant to fill the unexpired term of E. M. Ratliff, resigned, as the vote showed eight 'ayes,' and no 'nays.' "

B. F. Campbell, J. H. Phillips, W. J. Lewis, and J. H. McIlroy, members of the Board of Managers, were called as witnesses. Campbell testified: "Mr. Gladson was a member of the Board of Managers and superintendent of the water plant, and attended meetings of the Board of Managers. He made motions and voted as did all the other members." Phillips testified: "The Board of Commissioners worked together with the Board of Managers, and met with us to conduct the operation and management of the plant. Mr. Gladson was a member of the Board of Managers after Mr. Ratliff resigned, and voted and took part in all that the Board did. He was appointed a member of the Board." Lewis testified: "Each commissioner of Water Improvement District No. 1 was also a member of the Board of Managers of the City Water Plant. The commissioners' duties, as such, had nothing to do with the Board of Managers, but they were all members of the Board. . . . The commissioners were always on the Board of Managers, and Gladson acted with the members of the Board of Managers, attending the meetings. He voted and acted as any other member of the Board." McIlroy testified: "The three commissioners and three other persons appointed by the Council always met together, and the meetings were referred to variously as 'Minutes of the Meeting of the Commissioners and Board of Managers of City Water Plant,' or sometimes, 'Meeting of the Board of Managers.' All six voted on matters coming before the group,

made motions—and all were active in operation of the water plant. . . . Mr. Gladson was present at all of the meetings since he was made a member of the Board of Managers in October, 1935, except those times when he was in the hospital or out of town on account of bad health. When Mr. Gladson was at meetings he made motions and seconded motions, and voted just like the other members.''

Appellant, called as a witness for plaintiffs, testified: ''At the time I served as superintendent the water plant was operated by the Board of Managers. At that time I thought there were six members, including myself.''

''Q. At the time of Mr. Ratliff's death, when you took the oath, you acted with the Board of Managers? A. I met with them to advise them on new construction. Q. You acted like you were a member of the Board? A. Yes. Q. Until you were enjoined? A. Yes. Q. Except for a few details, the Commissioners and managers sat together? A. The Board of Commissioners are members of the Board of Managers. I don't know whether they met as Commissioners or Managers. . . . Q. You acted as a member of the Board of Managers? A. Yes.''

. There is little difference between the testimony of other witnesses called by appellees, and the testimony of appellant himself. Matter with which we are concerned is proper construction to be put upon the conduct, circumstances, and facts which are not in dispute.

It is true, as appellant insists, that his contract of employment as acting superintendent was not a contract between himself and the Board of Commissioners of Water Improvement District No. 1, but was a contract between him and the City of Fayetteville, the latter acting through its agency, the Board of Managers.

But assuming, without holding, that the city had full power to delegate its functions of management to a board composed of the three Commissisoners and three others appointed to serve with them, it must follow that in any event the city was the principal. It was the mov-

ing power, the source of authority, the only legal entity— for the Commissioners were not acting as such. If it be urged that the City Council, by appropriate resolution, had authority to employ, on a basis of compensation, any one, or all, of those who were named to serve, the answer is that the city did not do this.

The so-called "Board of Managers," acting, no doubt, in perfect good faith, ascribed to themselves the right to employ appellant, and appellant was a member of the group which consummated this irregular transaction. Though not a member of the Board of Managers when he began serving as acting superintendent, he quite honestly, and with praiseworthy credit to himself and to the subject of controversy, conceded that while serving as superintendent he regarded himself as a member of the Board, and deported himself accordingly.

In *Faucett* v. *Gerlach*, 132 Ark. 58, 200 S. W. 279, it was said: "An officer *de facto* is one who by some color of right is in possession of an office, and for the time being performs its duties with public acquiescence, though having no right in fact."

It is urged in the instant case that "color of right" is lacking; that appellant was not an officer *de facto;* that not having been appointed to membership on the Board, he had no part in his own selection as superintendent; and consequently, no rule of public policy, and no statute, has been transgressed.

This argument is met by appellees with the declaration that there was a *de jure* office, and that the city ordinance, referred to *supra,* provided for a Board of Water Managers.

It is our view that no office whatever was created; that the appointees were mere agents of the city, without power to incur liabilities beyond the scope of their agency, such scope to be implied from the nature of the duties assigned. City Councils serve as public agents for the citizens collectively, and acts of such bodies are confined to a stricter degree of accountability than are those of private agents. It is different with a district over which a board of improvement has authority. In such

case the board is not the agent of the city, for its powers are derived directly from the legislature, and in exercising them the board acts as the agent of the property owners whose interests are affected by the duties it performs. *Fitzgerald* v. *Walker,* 55 Ark. 148, 17 S. W. 702.

In *Jonesboro* v. *Montague,* 143 Ark. 13, 219 S. W. 309, we said: "When the powers to be performed by the governing body of municipal corporations are of a ministerial, or executive nature, they may delegate the power to a committee. The business of municipal corporations, like other corporations, must be conducted through agents."

Under Pope's Digest, § 9588, formalities are prescribed which must be complied with by municipal corporations before a contract may be entered into. It is there provided that "On the passage of every by-law or ordinance, resolution or order, to enter into a contract, . . . the yeas and nays shall be called and recorded." If this is not done the attempt to make such contract has failed. *Frick* v. *Brinkley,* 61 Ark. 397, 33 S. W. 527; *Natural Gas & Fuel Corporation* v. *Norphlet Gas & Water Co.,* 173 Ark. 174, 294 S. W. 52.

It is contended by appellant that he had a valid contract of employment—a contract as superintendent. Even though it should be held that the manner of establishing such relationship was not contrary to public policy, such alleged contract made through instrumentality of the so-called Board of Managers was not binding, for it had never been formally authorized or approved by the City Council. No authority was given in the ordinance creating the Board of Managers for that body to employ a superintendent. It follows that payment of appellant's salary was a proper subject of injunctive process.

By their cross-appeal appellees seek to recover amounts paid appellant during his period of informal employment.

In *Spearman* v. *Texarkana,* 58 Ark. 348, 24 S. W. 883, 22 L. R. A. 855, it was held that where a physician who constituted a member of the board of health of a city

was employed by the board, without agreement as to compensation, to render necessary professional services on behalf of the city, the city was liable for such services on a *quantum meruit*.

The same principle was declared in *Tallman* v. *Lewis,* 124 Ark. 6, 186 S. W. 296. After reviewing a number of cases, the following appears in the opinion: "In each of these cases the contract was considered upon the ground of public policy alone. In such cases the contract, before it is performed, may be avoided by one of the parties because the other party at the time of its execution acted in a fiduciary capacity. When, however, it has been executed without objection, and actual benefits have been received under it, all parties acting in entire good faith, the law is maintained and the ends of justice subserved by allowing compensation on the *quantum meruit* or the *quantum valebant* for the reasonable value of the benefits received under it. There is a distinction to be made between a contract which is illegal because its execution requires the performance of an immoral or unlawful act, or transgresses an express statutory prohibition, and one wherein the act to be performed is lawful, but the contract is invalid upon the ground of public policy alone. The general rule is that when a contract is expressly prohibited by law, no court of justice will entertain an action upon it or upon any asserted right growing out of it." See *Fort Smith* v. *Giant Manufacturing Company,* 190 Ark. 434, 79 S. W. 2d 440; *City of Little Rock* v. *The White Company,* 193 Ark. 837, 103 S. W. 2d 58.

At most it can only be said that the contract entered into between the Board of Managers and appellant was one not authorized by law, and that appellant's participation in financial benefits arising from the contract while he was serving as a member of the Board which made it, was contrary to public policy. It was not an illegal or immoral contract; hence, retention by appellant of a sum equal to the actual value of his services is permissible. There is no evidence even tending to show that the services rendered were not worth $200 per month.

The judgment is affirmed on appeal and cross-appeal.