(No. 44744.—

THE PEOPLE *ex rel.* WILLIAM J. SCOTT, Attorney General, Petitioner, v. JOHN A. GRIVETTI *et al.,* Respondents.

*Announced Dec. 10, 1971.—Opinion filed Dec. 17, 1971.*
*Modified on denial of rehearing Jan. 27, 1972.*

UNDERWOOD, C.J., concurring in part and dissenting in part.

WILLIAM J. SCOTT, Attorney General, of Springfield, for petitioner.

JEROME H. TORSHEN; ARTHUR C. THORPE; SIEGAL, SABLE & STONESIFER; SCHIFF, HARDIN, WAITE, DORSCHEL & BRITTAN; all of Chicago; JOHN

GRIVETTI, of Peru, JOHN E. (JACK) CASSIDY, of Peoria, and PETER FITZPATRICK, of Chicago, for respondents.

PER CURIAM: Decision of this case was announced by our order of December 10, 1971, released simultaneously with the opinion of the three-judge Federal court composed of Circuit Judge Sprecher and District Judges Austin and Napoli. Our December 10 order expressed to Judges Sprecher, Austin and Napoli our appreciation for their cooperation in accomplishing an expeditious resolution of the problems concurrently presented to both courts. That order indicated an opinion would be filed setting forth the reasons for the conclusions which we reached. This is that opinion.

This is an original action which presents for our consideration the question of the constitutional validity of the decennial redistricting plan for Illinois House and Senate districts filed with the Secretary of State by the Legislative Redistricting Commission. Six other actions challenging the redistricting of the Illinois legislative districts were pending in the Federal District Court for the Northern District of Illinois at the time of commencement of these proceedings. All of the plaintiffs in those actions have been impleaded as respondents in this case, and it appears that all substantive issues before the Federal court are also raised in this proceeding. In view of the recognized state judicial power "to require valid reapportionment or to formulate a valid redistricting plan" *(Scott v. Germano, 381 U.S. 407, 409, 14 L.Ed.2d 477, 85 S.Ct. 1525),* and because the date for filing of nominating petitions for the House and Senate was fast approaching we expedited the hearing and disposition of this case.

The method of redistricting the State legislative districts is set forth in section 3(b) of article IV of the 1970 constitution. That section provides in relevant part that "in the year following each Federal decennial census year, the General Assembly by law shall redistrict the

Legislative Districts. If no redistricting plan becomes effective by June 30 of that year, a Legislative Redistricting Commission shall be constituted not later than July 10. The Commission shall consist of eight members, no more than four of whom shall be members of the same political party." With regard to the manner of selection of the Commission, the constitution provides that "the Speaker and Minority Leader of the House of Representatives shall each appoint to the Commission one Representative and one person who is not a member of the General Assembly. The President and Minority Leader of the Senate shall each appoint to the Commission one Senator and one person who is not a member of the General Assembly." Section 3(b) further states that "not later than August 10, the Commission shall file with the Secretary of State a redistricting plan approved by at least five members." It is also provided that "an approved redistricting plan filed with the Secretary of State shall be presumed valid, shall have the force and effect of law and shall be published promptly by the Secretary of State."

The 77th General Assembly failed to redistrict itself prior to June 30, 1971, following the decennial census year of 1970. Accordingly, a Legislative Redistricting Commission was constituted. The Speaker and Minority Leader of the House of Representatives and the President Pro-Tem of the Senate each appointed themselves to the Commission and also appointed their respective legislative aides as non-General Assembly members of the Commission. The Minority Leader of the Senate appointed another Senator of his choice to the Commission and also appointed another individual as a non-General Assembly member of the Commission. Thus constituted, the Commission adopted a redistricting plan and filed it with the Secretary of State prior to the August 10, 1971, deadline. It is this plan which is now before us for review.

The five primary issues raised in oral argument and in the pleadings filed by the various parties herein may be

summarized as follows: (1) Is section 3(b) of article IV of our constitution violative of the Federal constitution in that it places the selection of the Redistricting Commission under the control of the majority and minority leaders of the House and Senate; (2) Was the Legislative Redistricting Commission properly selected in accordance with section 3(b) of article IV of the constitution; (3) Did the redistricting plan meet the State and Federal "one man-one vote" constitutional requirement and the further requirement of the Illinois constitution that all districts be compact and contiguous; (4) Is the redistricting plan invalid in that it does not adhere strictly to traditional and political boundaries; and (5) What is the effect of certain "corrections to the redistricting plan filed with the Secretary of State by members of the Legislative Redistricting Commission on November 5, 1971?

As to the first issue, certain of the respondents contend that section 3(b) of article IV of our constitution is violative of the first amendment and the equal protection clause of the fourteenth amendment to the constitution of the United States in that it places control over the redistricting process in the hands of the major party leaders and excludes any participation by representatives of other political parties or independent voters; i.e., there is a denial of access to reapportionment proceedings to all persons who are not affiliated with, or members of, the two major parties. On its face section 3(b) neither restricts membership on the Commission to particular political parties or persons claiming particular interests nor does it exclude them. More importantly, however, there has been no showing in this case of how the provisions in question have any legally harmful effect on respondents. Respondents imply that unless they take part in the selection of the Legislative Redistricting Commission their interests will not be represented on the Commission with the result that any redistricting plan adopted by the Commission inevitably will discriminate against them. This argument is

highly speculative and abstract and, in our opinion, does not provide any basis for a legal remedy. If every group having particular political viewpoints or alleging particular interests was required to be directly involved in the selection of the Commission or directly represented on the Commission itself, it is obvious that the group selecting the Commission and the Commission itself would reach almost boundless and unworkable proportions. It must also be remembered that section 3(b) places initial responsibility in the legislature to adopt a redistricting plan. At this stage the redistricting process is entirely under the control of a body elected by all the people. Only when the legislature fails to fulfill its duty to redistrict does the smaller, eight member Legislative Redistricting Commission come into being to accomplish that task. In our opinion, this is neither an unreasonable nor discriminatory method of attempting to provide a solution to legislative nonfeasance. Also, in drawing the districts, the Commission is clearly bound by section 3(a) of article IV which provides that "legislative districts shall be compact, contiguous and substantially equal in population." If the Commission complies with this constitutional mandate, a matter which is subject to judicial review, then all voters of the State of Illinois will thereafter have an equal voice in electing State legislators. We conclude that section 3(b) of article IV of the constitution on its face is not violative of the first amendment and the equal protection clause of the fourteenth amendment to the United States constitution and does not infringe upon any constitutionally protected interests of the respondents in this case.

It is also argued that section 3(b) of article IV of the constitution reflects an improper delegation of legislative power. The answer to this contention is that we are not here concerned with a State legislative enactment which purports to delegate functions of a legislative nature, but rather with a provision of our State constitution which expressly directs the redistricting of the legislature by the

Legislative Redistricting Commission in accordance with specified standards. It is clear that no real delegation of power question under either the State or Federal constitutions is involved in this case.

It is further contended that the Legislative Redistricting Commission created by section 3(b) of article IV was illegally composed in that three of the persons having appointive power appointed not only themselves but also their legislative aides to the Commission.

We agree, for the purpose of section 3(b) of article IV is, in our judgment, completely clear. As originally proposed to the 1970 Constitutional Convention by the committee on the legislature, it provided for a redistricting commission composed of eight members of the legislature, two of whom were to be appointed by the majority leader, and two by the minority leader in each house. That proposal was predicated on the fact that the original committee recommendation excluded the legislature from the reapportionment process. On first reading, however, the procedure was changed to give the legislature the first opportunity to reapportion. Thereafter an amendment, co-sponsored by others, was offered by Delegate Perona, the substantive effect of which was to reduce the legislative representation on the eight-member commission to four, to be selected in the same manner as the original eight. The other four commission members were to be appointed by the same legislative leaders but were to be "person[s] who [are] not" members of the General Assembly.

The explanation of that amendment as given by Delegate Perona in the debates preceding its adoption is in part as follows: "It is the position of the supporters of this amendment, who include myself, Mr. Lewis, Mrs. Reum, Mr. Peccarelli and Mr. Sommerschield, Mrs. Pappas, Mr. Martin, Mrs. Netsch and Mr. Parkhurst, that given the opportunity in the Legislature to have first crack at the process of apportionment that it would be wise in the

second step of the process to introduce some nonlegislative members to hopefully, if necessary, bring in a new viewpoint of a little different point of view to the process. This amendment in the place of an eight member legislative commission would substitute four legislative members and four non-legislative members. They would still be appointed by the same persons and the equal party division would remain the same. We feel that this concept is in line with the original concept but because of the change in situation insofar as the procedure, that this would be an advantage and a change that would make sense with this situation in existence." Sixth Illinois Constitutional Convention Debates, Vol. 107, pp. 338-39.

Other delegates in the course of their arguments supporting the subsequently adopted amendment stated the inclusion of the four public members would "inject a little new blood, so to speak, into the process of reapportionment" (Delegate Evans at 341); "I think it's rather ridiculous to have a reapportionment commission which acts after the legislature has failed to reapportion, which is wholly legislative in nature" and the amendment would "put some life back in the process" (Delegate Sommerschield at 342). The Perona amendment was adopted by a vote of 54 to 26.

It is abundantly clear that the intent of the delegates to the 1970 Constitutional Convention was to create a redistricting commission composed of four legislators and four public members, and that their purpose in so doing was to bring into the commission a fresh, perhaps more objective, approach to the apportionment problems which had deadlocked the legislature. By requiring one half of the commission's membership to be individuals not theretofore involved in the legislative redistricting struggles, the prospects of the commission's success were thought to be enhanced.

While appointment to membership on the commission of their legislative aides by the President Pro Tem of the

Senate and the Speaker and Minority Leader of the House was a literal compliance with the language of section 3(b), since those aides were not, in the strict sense, "members of the General Assembly," that action was, in reality and in practical effect, a subversion of the purpose of that language. Nor do we believe the action of the President Pro Tem of the Senate and the Speaker and Minority Leader of the House of Representatives in appointing themselves to the commission was authorized by the Constitutional provisions. Had such action been contemplated, section 3(b) would have so stated, particularly when it is considered that the public policy against self-appointment is of long standing and well known. The fact that no compensation is provided for members of the commission is immaterial.

The net result of this action was, in our judgment, the same as though six members of the legislature had been appointed, for, although the aides were not technically members of that body, it is obvious that, as its employees and assistants to its leaders, they could scarcely be thought to be independent of it. Clearly they were not representative of the general public nor likely to bring to the reapportionment proceedings the "fresh approach" envisioned by the delegates at the time the amendment mandating the appointment of four public members was adopted.

The thwarting of the purpose of the "public member" provision is even more apparent when the actual result of the commission's deliberations is analyzed. The redistricting plan adopted by the commission received the approving votes of six of its eight members. Those six votes were cast by the self-appointed legislative members and their aides. Senator Clarke and former Governor Stratton (both of whom had been appointed by the Minority Leader of the Senate) voted against the plan. It is, of course, apparent, that violation of the constitutional mandate that the commission be composed one half of

legislators and one half of public members resulted in almost total exclusion of the public, since seven of the eight commission members were either legislative members or their alter egos. Under these circumstances, to hold the commission a *de facto* body and its product valid would sanction an impermissible violation of the constitution's commands.

The dissenting opinion would sanction the continuation of the violation or disregard of constitutional provisions that prevented legislative reapportionment in this State under the constitution of 1870. The extensive dictum in that opinion concerning the desirability of a "ten-year plan" assumes that within each ten-year span there will be no population shifts which will require reapportionment under the Federal constitution. It also assumes that action by an illegally constituted commission will be less heavily partisan than action by the General Assembly. In our opinion neither assumption is warranted.

While we recognize that under less extraordinary circumstances the rule followed in cases such as *Engle v. Kerner, 32 Ill.2d 212, People ex rel. Chillicothe Twp. v. Board of Review, 19 Ill.2d 424,* and *Leach v. People ex rel. Patterson, 122 Ill. 420,* might well prevail and the commission be considered a *de facto* body and its work product valid, we believe that rule cannot here prevail. The fundamental difference between those cases and this is manifest. In *Engle* we held our State Senate, the members of which had been elected from unconstitutionally apportioned districts, was composed of *de facto* officeholders with authority to act; in *Chillicothe Twp.* a board of review with two Democratic—one Republican membership was held to be composed of *de facto* officers and its acts valid as to third parties even though the statute governing membership on the board apparently required, in view of the results of the immediately preceding election, a two Republican—one Democratic division; in *Leach* members of a board of supervisors elected pursuant

to a statute held to be unconstitutional were nonetheless held to be *de facto* officers. It will be observed that in those instances, the defect in the appointment or election arose, not from the acts of the individuals whose subsequent performance of the duties of the office is challenged, but from sources beyond their control. Here, the opposite is true. The presence of the legislative leaders and their aides upon the Redistricting Commission is the direct result of the acts of those individuals. Under these circumstances we do not believe they can be accorded a *de facto* status which would validate the resulting plan. The strong public policy against self-appointment described in 3 McQuillen, Law of Municipal Corporation, 3d Ed. sec 12.75, and 43 Am.Jur. Public Officers, sec 97, precludes recognizing as valid a product formulated by means so completely at variance with the constitutional mandate. *State v. McDaniel, 52 Del. 304, 157 A.2d 463; State v. Thompson, 193 Tenn. 395, 246 S.W.2d 59; Arbogast v. Shields, 123 W.Va. 167, 14 S.E.2d 4, 7; Ehlinger v. Clark, 117 Tex. 547, 8 S.W.2d 666.*

In view of our previously exercised responsibility *(People ex rel. Scott v. Kerner, 32 Ill.2d 539; People ex rel. Engle v. Kerner, 33 Ill.2d 11)* to determine that the legislative body of this State is elected pursuant to a constitutionally valid plan, we proceed to consider whether the plan before us complies with other State and Federal constitutional requirements and is therefore suitable for adoption by us as a provisional reapportionment plan.

It is well settled as a matter of Federal constitutional law that State legislative districts must meet the "one man—one vote" equality of population requirement. *(Hadley v. Junior College District, 397 U.S. 50, 25 L.Ed.2d 45, 90 S.Ct. 791; Kirkpatrick v. Preisler, 394 U.S. 526, 22 L.Ed.2d 519, 89 S.Ct. 1225; Reynolds v. Sims, 377 U.S. 533, 12 L.Ed.2d 506, 74 S.Ct. 1362; Baker v. Carr, 369 U.S. 186, 7 L.Ed.2d 663, 82 S.Ct. 691; Wesberry*

*v. Sanders, 376 U.S. 1, 11 L.Ed.2d 481, 84 S.Ct. 526.)* The 1970 Federal Decennial Census shows that the State of Illinois had a population of 11,113,976. Consequently, the mathematically "perfect" population of each of the State's 59 legislative districts would be 188,372. The actual population, as indicated by the Commission, of each of the new legislative districts deviates less than 1% from thie "perfect" figure. In our opinion, the plan complies as closely as reasonably possible with the Federal "one man—one vote" requirement and the corresponding provisions of section 3(a) of article IV of our constitution that all legislative districts shall be "substantially equal in population."

Certain of the respondents in this case contend that the redistricting plan does not meet the requirements of section 3(a) of article IV of the Illinois constitution that legislative districts shall be compact and contiguous. It is apparent that not all of the legislative districts are perfectly compact, and it is equally apparent that some districts are more physically compact than others. However, compactness, while an end to be sought in the redistricting process, is clearly subservient to the dominant requirement of equality of population among legislative districts. In view of this fact, and upon consideration of the plan as a whole, we are of the opinion that the plan contains reasonably compact and contiguous legislative districts and is not violative of section 3(a) of article IV of the constitution.

It is further argued by respondents that the redistricting plan if invalid because it fails to take into account traditional political boundary lines. As an example, it is pointed out that the city of Evanston is divided between two legislative districts, each of the villages of Oak Park and Skokie is divided between three districts, and the village of Arlington Heights is divided between four districts. Respondents contend that these divisions effectively diminish the power of the citizens of each munici-

pality as a group to elect representatives of their choice to the General Assembly. They argue further that under the redistricting plan they do not share a community of interest with individuals in other parts of the newly created districts. We can well understand the respondents' desire that their respective municipalities be located within one single legislative district. With respect to congressional redistricting, the United States Supreme Court has held that there is no justification for any population variances which result from a State's attempt to avoid fragmenting political subdivisions by drawing congressional district lines along existing county, municipal or other political subdivision boundaries. *(Kirkpatrick v. Preisler, 394 U.S. 526.)* While this holding may not necessarily apply with full force and effect to the redistricting of state legislative districts *(Reynolds v. Sims, 377 U.S. 533)* or to redistricting involving county government *(Abate v. Mundt, 403 U.S. 182, 29 L.Ed.2d 399, 91 S.Ct. 1904)*, it is nevertheless very clear that the "one man-one vote" requirement must be the controlling consideration in the apportionment of seats in any particular legislative body. Considering the high density of population in the area surrounding Chicago and the large number of municipalities of diverse size and population within that area, we think it would be practically impossible to conceive a redistricting plan which would keep every municipality intact and at the same time comply with the Supreme Court's "one man—one vote" rule. We note also that there is no question here of the type of invidious descrimination of a racial or even political nature which the court has frowned upon in the past. *(Burns v. Richardson, 384 U.S. 73, 16 L.Ed.2d 376, 865 S.Ct. 1286; Fortson v. Dorsey, 379 U.S. 433, 13 L.Ed.2d 401, 85 S.Ct. 498; Gomillion v. Lightfoot, 364 U.S. 339, 5 L.Ed.2d 110, 81 S.Ct. 125.)* Accordingly, it is our opinion that this redistricting plan may be adopted despite the obvious fragmentation of the established political subdivisions.

The redistricting plan heretofore filed with the Secretary of State of Illinois on August 7, 1971, as subsequently corrected, in our opinion complies with both State and Federal constitutions. It is therefore adopted by this court as a provisional redistricting plan for the election of members of the General Assembly of this State in 1972. A redistricting plan for subsequent elections shall be adopted pursuant to the procedures outlined in section 3 of article IV of the 1970 constitution of this State.

*Provisional redistricting plan adopted.*

MR. CHIEF JUSTICE UNDERWOOD, concurring in part and dissenting in part:

I am in agreement with the opinion of the Court except in two respects: I do not believe the action of the President Pro Tem of the Senate and the Speaker and Minority Leader of the House of Representatives in appointing themselves as members of the Restricting Commission was necessarily repugnant to the intent and purpose of section 3(b); and, in my judgment, the Commission should be held to be composed of three *de facto* and five *de jure* officers and its product a valid **plan.**

In my opinion the very substantial majority of the reported decisions, both in Illinois and elsewhere, support the conclusion that the legislative aides to the President Pro Tem of the Senate and to the Speaker and Minority Leader of the House were *de facto* members of the Commission and their acts in that capacity valid as to third parties or when those acts concerned the public as they necessarily did here. As this court said in *People ex rel. Hess v. Wheeler, 353 Ill. 147, 150:* "The commissioners had power to make a temporary appointment of a treasurer and thus create a *de jure* officer. Though their appointment was of one who was not entitled or qualified to serve, yet it has many times in this State been held that the acts of one acting as a *de facto* officer are valid when they concern the public or the rights of third persons who have

an interest in the act done. *** Such a person will be considered a *de facto* officer though there may be irregularities in his appointment or lack of qualification on his part which would be fatal to his title in a direct proceeding. [Citing cases.] " See also, *People ex rel. Engle v. Kerner, 32 Ill.2d 212; People ex rel. Chillicothe Twp. v. Board of Review, 19 Ill.2d 424; Leach v. People ex rel. Patterson, 122 Ill. 420; Gladson v. Wilson, 196 Ark. 996, 120 S.W.2d 732; State ex rel. Hawthorne v. Wiseheart, 158 Fla. 267, 28 So.2d 589; Hetrich v. County Com'rs. of Anne Arundel County, 222 Md. 304, 159 A.2d 642; Commonwealth ex rel. McCreary, Dist. Atty. v. Major, 343 Pa. 355, 22 A.2d 686; State ex rel. Kenney v. Ranslow, 21 Conn.Supp. 294, 154 A.2d 526.*

The self-appointment by the legislative leaders condemned by the court deserves separate treatment. That condemnation is predicated upon the strong public policy against such action. That public policy has been announced, however, only—so far as I am aware—in those cases where the governing law did not authorize members from the appointing group to serve upon the body or in the office to which the appointment is made. Here, however, we have a significant and, I believe, a controlling distinction. Section 3(b) specifically provides that two senators and two representatives shall be appointed to the Commission. I am not at all certain that the self-appointment is contrary to public policy nor inconsistent with the intent of the framers of the constitution. The cases relied upon by respondents, in McQuillen, Law of Municipal Corporations, 3d ed., sec. 12.75, and in American Jurisprudence (42 Am. Jur., Public Officers, sec. 97), generally speaking, dealt with situations where municipal officers exercised appointive powers to place themselves in other remunerative positions in municipal government. The appointments there were self-serving in nature, and the conflicts of interest inherent in the appointments were apparent. Here, to the contrary, I see in the presence upon the Commission

of the legislative leaders nothing inconsistent with the constitutional provision, and the self-appointment aspects of the matter do not involve the objectionable characteristics found in the cases and text material cited by respondents and the court. Nor do I agree that failure of the constitution to specifically authorize service by the President Pro Tem, Speaker and Minority Leader upon the Commission necessarily manifests an intent that they shall not appoint themselves. It may as easily be construed to manifest an intent to grant complete flexibility in the exercise of the appointing power.

Consequently, while I am in complete agreement that the appointment of the legislative aides was improper, I do not find in the self-appointment by the legislative leaders the objections apparently seen by my colleagues.

The differences between my views and those of my colleagues may, at first reading, seem too unimportant to warrant a dissent. On the contrary, it is, in my opinion, quite an important difference. As I understand our constitutional provisions incorporated in section 3(b), reapportionment shall occur "in the year following each Federal decennial census," and adoption of a redistrcting plan is insured by a series of provisions, imposing that duty upon the General Assembly initially. Should it fail to succeed by mid-year a Redistricting Commission of eight members (no more than four from one political party) comes into being; failure of five members of that Commission to agree upon a plan results in the random choice of a "tie-breaker" (one of two persons of different political parties named by this court). This well-considered plan comes as close as human limitations permit to guaranteeing a reapportionment plan for this State in the year following each decennial census. Such plan, as I understand the constitution, will then prevail for the decade following its adoption—assuming, of course, it meets Federal and State constitutional requirements. Clearly, it is intended that it not be subject to change within that ten-year period,

unless that change is necessitated by population shifts.

It seems to me, however, that only a legislatively adopted or Commission adopted plan is within the "once-a-decade" provisions of 3(b), a belief reinforced by the fact that the effect of the final paragraph of the majority opinion provides that post-1972 elections shall be conducted pursuant to a legislatively or commission-adopted redistricting plan. Thus, the net result of the court's action is to convert into a one-election, one-year plan what was intended as a ten-year plan. If political fortune heavily favors one or the other of the major political parties in 1972, a substantially more partisan redistricting plan will be legislatively approved in 1973. That plan would then remain in effect for such portion of the ten-year period as remained and the next decennial reapportionment would then be undertaken by a heavily partisan legislature, thus, in all likelihood, perpetuating political control of the legislative branch of our State government in the hands of one or the other of the major parties. Such a result seems to me fundamentally undesirable.

Too, it should be remembered that any plan so adopted in 1973 will, almost automatically, be contested as this one was in both State and Federal courts with all of the uncertainty and instability in the election process which necessarily results. Certainty and stability in the boundaries of election districts (to the extent achievable in the narrow limits of existing "one-man one-vote" requirements) are, I think, highly desirable. The temporary redistricting plan which this court now creates serves only to promote an opposite result.

Whatever respondents may consider the other faults of the plan before us to be, there is no claim that it is heavily weighted in favor of either major party. I cannot agree that it should be converted into a temporary arrangement, nor that the General Assembly should be required to dissipate its time and energy in an effort to reapportion in 1973

when the best efforts of our legislators should be concentrated on resolving the truly significant problems before them.