(No. 55661.—

GEORGE E. SCHRAGE III, County Clerk, *et al.*, Plaintiffs, v. THE STATE BOARD OF ELECTIONS *et al.*, Defendants.

*Opinion filed November 25, 1981.*

SIMON, J., concurring in the decision.

Anthony B. Cameron, State's Attorney, and Thomas F. Londrigan, of Londrigan & Potter, of Springfield, for plaintiffs George E. Schrage III and Samuel W. Wolf.

John R. Keith and Giffin, Winning, Lindner, Newkirk, Cohen & Bodewes, all of Springfield, for plaintiff-intervenors Samuel H. Shapiro *et al.*

Tyrone C. Fahner, Attorney General, of Springfield (Paul P. Biebel, Jr., and Gladys M. Stevens, Assistant Attorneys General, of Chicago, of counsel), for defendants State Board of Elections *et al.*

Troupis & Troupis, of Mendota (Christ T. Troupis and James R. Troupis, of counsel), for defendant Judith Koehler.

Philip J. Rock, intervenor, *pro se.*

JUSTICE RYAN delivered the opinion of the court:

This is an original action for declaratory judgment concerning the 1981 legislative redistricting plan. The plan

was filed with the Secretary of State pursuant to article IV, section 3(b), of the Illinois Constitution of 1970. That section of the Constitution also vests this court with original and exclusive jurisdiction over actions concerning redistricting of the Illinois House and Senate. Our Rule 382(a) governs the proceedings in such an action. (73 Ill. 2d R. 382(a).) Plaintiffs, George E. Schrage III, county clerk of Adams County, and Samuel W. Wolf, candidate for election to the 83rd General Assembly, filed this action seeking a declaration of the constitutional validity of the decennial redistricting plan for the Illinois House and Senate districts filed with the Secretary of State on October 5, 1981, by the Legislative Redistricting Commission. Named as defendants were the State Board of Elections, the Attorney General, Tyrone C. Fahner, the Secretary of State, Jim Edgar, and Judith Koehler, a candidate for election to the 83rd General Assembly. Five members of the Legislative Redistricting Commission, Samuel H. Shapiro, James J. Donnewald, Martin Murphy, Corneal Davis, and Michael McClain sought and were granted leave to join as plaintiffs. The Commission-member plaintiffs then moved to implead the parties plaintiff in three actions pending in Federal District Court for the Northern District of Illinois concerning the 1981 redistricting plan as parties defendant in the present action. That motion was denied. Because of the statutory timetable for filing nominating documents by candidates seeking legislative office for the 83rd General Assembly, we expedited the hearing of this case.

The Illinois Constitution provides that, in the year following each Federal decennial census year, the General Assembly shall redistrict the legislative districts, and that if no redistricting plan becomes effective by June 30 of that year, then a Legislative Redistricting Commission must be constituted no later than July 10. (Ill. Const. 1970, art. IV, §3(b).) (For a brief history of redistricting in Illinois, see Illinois Legislative Council, Redistricting in Illinois (1981).)

The Illinois Constitution further provides that the eight-member Commission shall file with the Secretary of State not later than August 10 a redistricting plan approved by at least five members of the Commission. Failing this, this court submits the names of two persons not of the same political party to the Secretary of State, who must publicly draw, by random selection, the name of one of the two persons who will serve as a ninth member of the Commission. With the addition of the ninth tie-breaking member, the Commission is then required to file a redistricting plan approved by at least five of the members not later than October 5. (Ill. Const. 1970, art. IV, § 3(b).) This procedure was followed in Illinois this year. When the eight-member Commission could not agree on a plan, this court submitted to the Secretary of State the names of ex-Governor Richard B. Ogilvie, a Republican, and ex-Governor Samuel H. Shapiro, a Democrat. The Secretary of State drew, by random selection, the name of ex-Governor Shapiro, who served as the ninth member of the Commission. It is the constitutional validity of this 1981 redistricting plan, filed by five members of the Commission, which plaintiffs seek to have this court declare valid in this action.

The action by plaintiffs seeking a judgment declaring the validity of the reapportionment plan is unnecessary because of the constitutional presumption of validity which attaches upon filing of the plan. Specifically, the Illinois Constitution provides:

> "An approved redistricting plan filed with the Secretary of State shall be presumed valid, [and] shall have the force and effect of law * * *." (Ill. Const. 1970, art. IV, § 3(b).)

In the instant case, with the exception of Representative Koehler's counterclaim, no specific attack on the redistricting plan has been filed with this court. Because of the constitutional presumption of validity, the reapportionment map is presumed valid absent a specific challenge. It should be noted, however, that, in addition to Representative

Koehler's challenge, filed as a counterclaim in the present action, there are also three challenges to the 1981 reapportionment plan pending in the United States District Court for the Northern District of Illinois. (Rybicki v. State Board of Elections, No. 81-C-6030; De Valle v. State Board of Elections, No. 81-C-6052, and Crosby v. State Board of Elections, No. 81-C-6093.) All three are class actions. The issues involved in those cases are not before this court. We cannot therefore determine the validity of the challenges to the redistricting plan presented in those cases. In this case, we therefore are only concerned with Representative Koehler's challenge to the constitutionality of the 89th Representative District.

In November 1980 the voters approved a constitutional amendment reducing the size of the Illinois House from 177 to 118 members and eliminating the three-member districts and cumulative voting. The amendment requires that the State be divided into 59 legislative districts (from each of which one State Senator is elected) and that each legislative district be subdivided into two representative districts of approximately equal population (from each of which one State Representative is elected). (Ill. Const. 1970, art. IV, § 2 (1980).) (See generally Illinois Legislative Council, Redistricting in Illinois (1981).) It is with the subdivision of Legislative District 45 into Representative Districts 89 and 90 that Representative Judith Koehler's counterclaim is concerned.

Judith Koehler, a resident of Henry, Illinois, in Marshall County, has served in the House of Representatives since 1980. She first requested the Attorney General to challenge the plan pursuant to article IV, section 3(b), of the Illinois Constitution (Ill. Const. 1970, art. IV, § 3(b)). The Attorney General declined to act on her request. In the interim, the present action was filed naming Representative Koehler as a defendant. She responded by filing a counterclaim, seeking to have newly drawn Representative District 89 declared invalid as violative of the compactness requirement of the

Illinois Constitution (Ill. Const. 1970, art. IV, § 3(a)).

Representative Koehler alleges that the 1981 reapportionment plan would create the 89th Representative District as a loosely bound-together group of 60 townships measuring in excess of 125 miles in length connected at its center by a strip of land six miles wide. As presently drawn, the district would stretch through seven counties and more than 60 towns, and would cover parts of four congressional districts, two Illinois Appellate Court districts, and five (pre-1981 apportionment) Illinois House of Representative districts. The proposed district would not be served by either a single common television station, or a single common newspaper. The issue thus presented by Representative Koehler's counterclaim is whether this representative district is compact within the meaning of article IV, section 3(a), of the 1970 Illinois Constitution.

The 1970 Illinois Constitution provides a three-part test of constitutional validity for redistricting plans under article IV, section 3(a). Specifically, it requires that the districts formed must be "compact, contiguous and substantially equal in population."

The 1970 Constitution does not itself define compactness, nor does it provide explicit standards for its determination. Compactness was, however, a requirement also present in the 1870 Constitution. That constitution required that all senatorial and representative districts be formed of "contiguous and compact territory." (Ill. Const. 1870, art. IV, §§ 6, 7.) The continuing importance of the compactness requirement was reflected in the Report of the Legislative Committee which proposed the language adopted by the 1970 Convention. It stated:

"Perhaps no standards for drawing legislative district boundaries possess a longer history than the traditional standards of compactness and contiguity. In our present Constitution, these standards are found in both Sections 6 and 7. These standards directly reflect the objective of improving legislative representation through seeking to insure that districts are not

gerrymandered." 6 Record of Proceedings, Sixth Illinois Constitutional Convention 1352-53 (hereafter cited as Proceedings).

While the word "compact" was not defined in the 1870 Constitution, this court was called on to give meaning to that term in a redistricting context as early as 1895. In *People ex rel. Woodyatt v. Thompson* (1895), 155 Ill. 451, this court ruled on a challenge to the constitutionality of an apportionment of the State into senatorial districts. It was argued that the districts were not formed of contiguous and compact territory. In *Thompson,* the court stated:

"[W]e are of the opinion that as used in the constitution, *** the word 'compact' means 'closely united,' and that the provision that districts shall be formed of contiguous and compact territory means that the counties, or subdivisions of counties, *** when combined to form a district, must not only touch each other, but must be *closely united, territorially.*" (Emphasis added.) (*People ex rel. Woodyatt v. Thompson* (1895), 155 Ill. 451, 478.)

While the court upheld the apportionment of the senatorial districts in *Thompson,* it nonetheless gave meaning to the constitutional compactness requirement.

A more recent opinion of this court in *People ex rel. Scott v. Grivetti* (1971), 50 Ill. 2d 156, is consistent with this standard. In *Grivetti* the court heard a challenge to the constitutional validity of the decennial redistricting plan for the Illinois House and Senate drawn by the Legislative Redistricting Commission under the 1970 Constitution. In *Grivetti,* as in *Thompson,* the court did not interpret the compactness standard to require perfect compactness as in a circle or a square. ( (*People ex rel. Scott v. Grivetti* (1971), 50 Ill. 2d 156, 166; *People ex rel. Woodyatt v. Thompson* (1895), 155 Ill. 451, 482.) Rather, it required that districts formed be "reasonably compact." *People ex rel. Scott v. Grivetti* (1971), 50 Ill. 2d 156, 166.

The court's observation in *Grivetti* that "compactness, while an end to be sought in the redistricting process, is

clearly subservient to the dominant requirement of equality of population among legislative districts" should not be read, as plaintiffs have urged, as a death knell to the compactness requirement. (*People ex rel. Scott v. Grivetti* (1971), 50 Ill. 2d 156, 166.) Rather, the recognition in that case of the necessity to comply with the "one man - one vote" requirement (*People ex rel. Scott v. Grivetti* (1971), 50 Ill. 2d 156, 167) simply emphasized the then-recent constraints which had been added to traditional considerations. The compactness standard is, after all, a constitutional requirement in Illinois (Ill. Const. 1970, art. IV, § 3(a)) and cannot be ignored in redistricting the State. It cannot be written out or replaced by another requirement short of redrafting or amending our present constitution.

Although the court has refused to require perfect compactness (*Thompson, Grivetti*), it has also refused to allow the constitutional requirement of compactness to be ignored. In *Thompson* the court unequivocally recognized the necessity to comply with the compactness standard. In that case it said:

"[I]f it clearly appeared that in the formation of any district the requirement of compactness of territory and equality in population had been wholly ignored, had not been considered or applied at all, to any extent, then the [result] would be clearly unconstitutional." (*People ex rel. Woodyatt v. Thompson* (1895), 155 Ill. 451, 477.)

In addition to the necessity for complying with the requirements of the Constitution, there are pragmatic reasons for taking cognizance of compactness. As recognized in both the 1870 and 1970 constitutions, requiring compactness prevents gerrymandering. In fact, compactness is "almost universally recognized" as an appropriate anti-gerrymandering standard. Edwards, *The Gerrymander and "One Man, One Vote,* 46 N.Y.U.L. Rev. 879, 893 (1971); Schwartzberg, *Reapportionment, Gerrymanders, and the Notion of Compactness,"* 50 Minn. L. Rev. 443, 444 (1966);

*People ex rel. Woodyatt v. Thompson* (1895), 155 Ill. 451, 479.

Although this court has not heretofore invalidated any legislative or representative district on the basis that it violates the constitutional compactness requirement, other States with similar constitutional provisions have done so. In *In re Legislative Districting of General Assembly* (Iowa 1972), 193 N.W.2d 784, 791, the Iowa Supreme Court ruled on an attack on the validity of a legislative reapportionment plan. The court held that plan to be unconstitutional for failure, *inter alia,* to comply with the compactness standard. The court found numerous house districts to be lacking in compactness and observed:

> "Nothing appears to indicate the strange shapes are necessitated by considerations of population equality or result from unfeasibility. The legislature failed to comply with the constitutional mandate to devise districts consisting of compact territory." *In re Legislative Districting of General Assembly* (Iowa 1972), 193 N.W.2d 784, 791.

Other States, too, have reached a similar result with regard to the compactness standard. In *Acker v. Love* (1972), 178 Colo. 175, 178, 496 P.2d 75, 76, the Supreme Court of Colorado held the reapportionment of the State legislative districts to be unconstitutional because the newly drawn districts failed to meet the constitutional mandate that each district be as compact in area as possible. In *Preisler v. Doherty* (1955), 365 Mo. 460, 284 S.W.2d 427, the Supreme Court of Missouri held seven senatorial districts established in 1952 to be invalid for failure to observe non-discretionary limitations imposed by the State constitution. Referring to *People ex rel. Woodyatt v. Thompson,* the Missouri Supreme Court found the districts to be invalid because, *inter alia,* "the Board did not apply the principle of compactness of territory in the 1952 redistricting but instead completely disregarded this mandatory provision of the

Constitution." (*Preisler v. Doherty* (1955), 365 Mo. 460, 469-70, 284 S.W.2d 427, 434.) One of the invalidated districts is strikingly similar to Representative District 89 which is before us in this case. See also *In re Livingston* (N.Y. Sup. Ct. 1916), 96 Misc. 341, 160 N.Y.S. 462; *In re Sherill* (1907), 188 N.Y. 185, 81 N.E. 124; *State ex rel. Barrett v. Hitchcock* (1912), 241 Mo. 433, 146 S.W. 40; Annot., 2 A.L.R. 1337, 1356 (1919).

It is possible to establish a mathematically precise standard of compactness. (See Reock, *Measuring Compactness as a Requirement of Legislative Apportionment*, 5 Midwest J. of Pol. Sci. 70 (1961); Dixon, *Computers and Redistricting: A Plea for Realism*, 2 Rut. J. of Computers & Law 15 (1971). However, we find it unnecessary to adopt such a procedure in this case. Rather, we can rely on a visual examination of the questioned district as other courts have done. In *In re Sherill*, the New York Court of Appeals observed:

> "A reference to the diagram will show how grossly the provision of the Constitution in regard to compactness has been violated in the thirteenth senatorial district which is within the county of New York." (188 N.Y. 185, 210, 81 N.E. 124, 132.)

In order to determine whether the reasonable compactness standard of *Thompson* and *Grivetti* has been met, a more precise measurement is unnecessary.

A visual examination of Representative District 89 reveals a tortured, extremely elongated form which is not compact in any sense. (See the following map.) Nor were the plaintiffs able to advance any reason which might possibly justify such a radical departure from the constitutional requirement of compactness in this case. As demonstrated later, equal population of the 89th and 90th districts can be achieved without doing violence to the concept of compactness. Whatever the reason, Representative District 89 fails to meet the compactness standard as required by article IV, section 3(a) of the 1970 Illinois Constitution.

89th Representative
   District
90th Representative
   District
45th Representative
   District

(As described in the 1981
Legislative Reapportionment
Plan)

We have already indicated that the constitutional requirement of compactness is not to be ignored both because it is a constitutional requirement and because it has traditionally been utilized as a safeguard against the creation of gerrymandered districts. There is, in addition, another important reason to require a strict adherence to this constitutional requirement. We have, after all, a representative form of government. The creation of a representative district which is extremely elongated and not "closely united" significantly impedes vital constituent-representative communication, thus preventing the achievement of a legislative process which is, in fact, representative.

The plaintiffs also contend that our decision in *People ex rel. Scott v. Grivetti* (1971), 50 Ill. 2d 156, requires that the population variance of each legislative and representative district must be less than 1%. We do not understand *Grivetti* to so hold. In fact, we interpret "substantially equal in population," as required by our constitution, to be as expansive as the Supreme Court's interpretation of "one man, one vote" as it applies to redistricting of State legislature. We will discuss later the decisions of the Supreme Court which have defined the constitutional limits of "one man, one vote" as applied to State legislative redistricting.

In *Grivetti* we stated that a plan in which each legislative district deviated in population less than 1% clearly was in compliance with the one-man, one-vote rule. We did not hold in *Grivetti* that our constitution of 1970 required that the population variance between each district must be less than 1%. We stated that a 1% population variance is constitutional, but we did not set that variance as a constitutional standard or limit that had to be observed in future redistricting. *People ex rel. Scott v. Grivetti* (1971), 50 Ill. 2d 156, 166.

The Illinois Constitution of 1970 requires that all legislative districts be "substantially equal in population." (Ill. Const. 1970, art. IV, § 3(a).) An interpretation of the "substantially equal in population" standard is contained in the

1970 constitutional convention legislative committee's explanation on the proposed standards for redistricting. The committee stated:

> "Recognizing that equality of population is the primary criterion for redistricting, the Legislative Committee decided to place the flexible phrase, 'substantially equal in population' in the sub-section on standards. The degree of flexibility of this phrase will clearly be determined by the courts. The Legislative Committee believes it is important to recognize the 'equality of population' criterion in a way which will allow redistricting in Illinois to accord with the prevailing Supreme Court decisions on this subject. Should the Supreme Court ever relax the 'one man, one vote' standard, Illinois would not be precluded from creating districts within more flexible population limitations imposed by the courts." (6 Proceedings 1293, 1354.)

The explanation of this standard as given by Delegate Perona in the debates is, in part, as follows:

> "Insofar as the population standard, the committee has adopted the terminology from *Reynolds v. Simms,* [(1964), 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362] which requires a substantial equality of population. It permits some leeway if the Supreme Court would permit leeway ***." (4 Proceedings 2935.)

It is thus clear that the requirement that legislative districts be "substantially equal in population" is coextensive with the Federal requirement of "one man, one vote" and that this constitutional standard is flexible and is to be interpreted in accordance with the prevailing United States Supreme Court decisions.

In recent years, the United States Supreme Court has relaxed the "one-man, one-vote" requirement as applied to the redistricting of State legislative districts. (See *Mahan v. Howell* (1973), 410 U.S. 315, 35 L. Ed. 2d 320, 93 S. Ct. 979; *Gaffney v. Cummings* (1973), 412 U.S. 735, 37 L. Ed. 2d 298, 93 S. Ct. 2321; *White v. Regester* (1973), 412 U.S.

755, 37 L. Ed. 2d 314, 93 S. Ct. 2332.) In *Reynolds v. Sims,* the Supreme Court recognized that "distinctions may well be made between congressional and state legislative representation" (*Reynolds v. Sims* (1964), 377 U.S. 533, 578, 12 L. Ed. 2d 506, 536, 84 S. Ct. 1362, 1390) in applying the equality-of-representation principle. The rationale for this distinction is that almost invariably there is a greater number of seats in a State legislative body than there are in congressional delegations; consequently, "it may be feasible to use political subdivision lines to a greater extent in establishing state legislative districts than in congressional districting while still affording adequate representation * * *." (*Reynolds v. Sims* (1964), 377 U.S. 533, 578, 12 L. Ed. 2d 506, 536-37, 84 S. Ct. 1362, 1390.) In *Mahan v. Howell* the court concluded that State legislative redistricting should be governed by the "as nearly of equal population as is practicable" equal protection standard of *Reynolds v. Sims,* not the more stringent, mechanical test of absolute equality of population enunciated in *Kirkpatrick v. Preisler* (1969), 394 U.S. 526, 22 L. Ed. 2d 519, 89 S. Ct. 1225, for congressional reapportionment. 410 U.S. 315, 324-25, 35 L. Ed. 2d 320, 330, 93 S. Ct. 979, 985.

In *Gaffney, White,* and *Mahan,* the Supreme Court relaxed the "one-man-one-vote" requirement and, in so doing, acknowledged another portion of Chief Justice Warren's majority opinion in *Reynolds v. Sims.* In these cases the court has recognized that substantial equality of population is the dominant standard, but that other factors should also be taken into consideration in redistricting State legislative districts.

In *Mahan v. Howell* the United States district court had concluded that a 16.4% total population variation between the largest and smallest districts was unconstitutional *per se* under the "one-man, one-vote" rule. The district court recognized that the variances were caused by the Virginia

General Assembly's desire to maintain the integrity of traditional political subdivision lines defined as county and city boundaries. The Supreme Court reversed, and stated:

"We likewise reaffirm its [*Reynolds v. Sims*] conclusion that '[s]o long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature.' " *Mahan v. Howell* (1973), 410 U.S. 315, 325, 35 L. Ed. 2d 320, 330, 93 S. Ct. 979, 985.

Later, in the same year, the court decided *Gaffney v. Cummings* and *White v. Regester,* wherein the maximum deviations between any two districts were 7.83% and 9.9%, respectively. In both cases the court pointed out that its reapportionment decisions do not require that all deviations from absolute equality, however small, must be justified by a rational State policy. Noting the 9.9% variance from the ideal population for a district, the court stated in *White v. Regester:*

"Very likely, larger differences between districts would not be tolerable without justification 'based on legitimate considerations incident to the effectuation of a rational state policy.' *Reynolds v. Sims* (1964), 377 U.S [533, 579, 12 L. Ed. 2d 506, 537, 84 S. Ct. 1362, 1391.]" 412 U.S. 755, 764, 37 L. Ed. 2d 314, 323, 93 S. Ct. 2332, 2338.

Plaintiffs state that local governmental unit boundaries are irrelevant and in argument have focused on the nearly perfect compliance with the equality-of-population requirement of the 89th and 90th legislative districts. Plaintiffs' argument implies that the essential criterion governing the Redistricting Commission was compliance with the 1% population deviation which this court held in *Grivetti* was

acceptable. We noted above that *Grivetti* did not establish a 1% deviation test or standard. The question of whether political subdivision boundaries have been ignored in the establishment of the 89th Representative District is not an issue in this case. However, we have cited the above cases touching on this subject to point out that in drawing State legislative district boundaries, absolute equality of population among the districts is not the sole consideration. Deviations are permitted, at least to the extent approved in the above cases, to accommodate the interests of political subdivisions. The desirability of making this accommodation was noted by Chief Justice Warren in *Reynolds v. Sims*:

> "A State may legitimately desire to maintain the *integrity of various political subdivisions, insofar as* possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims. Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering." 377 U.S. 533, 578-79, 12 L. Ed. 2d 506, 537, 84 S. Ct. 1362, 1390.

We have above discussed the intent manifested at the convention which drafted our 1970 Constitution that the requirements of our constitution concerning legislative redistricting be flexible enough so that its provisions may be capable of embracing the present, as well as the future, construction of the Supreme Court with regard to the "one-man, one-vote principle." It is clear that the sense of the convention was that the requirement of our constitution, as it pertains to legislative redistricting, be coextensive with those of the Federal Constitution. Therefore, the concern expressed by the Supreme Court in the above cases as to the need to recognize matters other than strict equality of population in redistricting for State legislative districts should also be matters of concern of the Redistricting Commission. Pursuant to the holdings of the above cases,

we recognize the need, within the confines of acceptable deviations from equality of population, to balance the needs of other interests in adopting a legislative redistricting plan. These cases have recognized the need to consider these other interests to obviate the potential for gerrymandering present in blind adherence to the standard of equality of population. Gerrymandering can be as invidious as malapportionment of population in depriving voters of an equal voice in choosing their representatives. The goal of "one man, one vote" cannot be achieved without eliminating the use of the gerrymandering as a device to dilute group voting strength. Edwards, *The Gerrymander and "One Man, One Vote,"* 46 N.Y.U. L. Rev. 879 (1971).

For the reasons stated above, we hold that the 89th Representative District, as drawn in the plan filed by the Redistricting Commission with the Secretary of State, is invalid. We do not pass on the validity of the other legislative or representative districts. No dispute has been raised as to their validity, and they stand unchallenged before this court. The constitutional presumption that these districts are valid will prevail until the contrary is established. It is possible in this case to correct the constitutional invalidity of Representative District 89 without affecting the rest of the plan other than Representative District 90.

Representative Koehler has submitted two alternative proposals for drawing the boundary between Representative District 89 and Representative District 90. It is contended that both compactness and substantial equality of population in the two districts will be achieved by drawing the boundary line in an east-west direction instead of a generally north-south direction as the Redistricting Commission has done.

The following maps and population figures have been submitted concerning the two alternative proposals. Plaintiffs have not disputed the accuracy of these figures.

ALTERNATIVE
NO. 1

ALTERNATIVE
NO. 2

Alternative #1
  Population (Census figures)
        89th  -  95,573
        90th  -  97,530
  Population - deviation from 96,767 (Perfect Statewide mean)
        89th  -  1.2%
        90th  -  .8%
  Maximum Length
        89th  -  48 miles
        90th  -  60 miles

Alternative #2
  Population (Census figures)
        89th  -  96,630
        90th  -  96,473
  Population - deviation from 96,767 (Perfect Statewide mean)
        89th  -  .1%
        90th  -  .3%
  Maximum Length
        89th  -  54 miles
        90th  -  60 miles

It is the order of this court that the State Board of Elections establish the boundaries between the 89th and 90th Representative Districts in accordance with the map of alternative proposal No. 2, which reflects the closer approximation to equality of population. The east-west boundary between the 89th and 90th representative districts will thus follow the north boundary lines of Dillon, Hopedale, and Little Mackinaw townships in Tazewell County; thence south along the county line to the north boundary line of Mount Hope township in McLean County; thence east to the northeast corner of said township.

Certain errors and omissions in the redistricting plan as filed with the Secretary of State have been called to our attention by the State Board of Elections. The plaintiffs have requested this court to correct them. It is not contended that any of these corrections will change the character of any district to the extent that it would render the same

invalid. These errors primarily are concerned with overlapping of certain district boundaries and complete omission of certain census tracts from any legislative district. A separate order will be entered directing the State Board of Elections to correct these errors and omissions.

It is the order of this court that the 89th and 90th Representative Districts as created by the redistricting plan filed with the Secretary of State by the Legislative Redistricting Commission are invalid. The State Board of Elections is directed to draw the boundaries between the 89th and 90th Representative Districts as set forth in this opinion.

On the court's own motion, the clerk of this court is directed to issue the mandate forthwith.

*Order entered.*

JUSTICE SIMON, concurring in the decision:

I concur in the result, but do not understand the need, in deciding this case, to review the requirements of *People ex rel. Scott v. Grivetti* (1971), 50 Ill. 2d 156, relating to permissible population variances, as the majority has done. Whether *Grivetti* permits variances of more than 1% consistently with the "one-man, one-vote" principle is not before us. No one raises that issue in this proceeding. No one contends or suggests that population variance in any legislative or representative district established by the map presented in this case is more than 1%. In fact all parties to this action have represented to us that all population variances in the map are less than 1%. The redrawn representative districts in the 45th Legislative District which we are approving by this decision present population variances of one-tenth of 1% in the 89th and three-tenths of 1% in the case of the 90th, variances which satisfy the most restrictive interpretation of *Grivetti*. In this setting, I see no need for the court's gratuitous advice that a greater variance would not offend *Grivetti*. The suggestion is clearly *dictum*. The only value it has is as a possible aid to those given responsi-

bility for legislative redistricting in future decennials. But, I trust they will be capable of grappling with the difficult problem of equal representation without our premature advice given without awareness of the circumstances which will confront the redistricters 10 years from now. For that reason, I think we should refrain from offering such guidance.

Besides, the court belies its own suggestion that a variance of more than 1% is acceptable by choosing alternative No. 2 over alternative No. 1 in redistricting the 89th and 90th Representative Districts, giving as its reason that the former "reflects the closer approximation to equality of population." (88 Ill. 2d at 108.) This convinces me that even if the majority believes variances of more than 1% are acceptable, it finds variances of less than 1% preferable.